**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 25 2000**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

        Plaintiff-Appellant,

v.

PETER PAUL HUDSON; TAMMY
MAE RINESS,

        Defendants-Appellees.

No. 99-2165

---

Appeal from the United States District Court
for the District of New Mexico
(D.C. No. CR-99-163-LH)

---

Mark D'Antonio, Assistant United States Attorney, Las Cruces, New Mexico,
(John J. Kelly, United States Attorney, with him on the brief), for Appellant.

Barbara A. Mandel, Assistant Federal Public Defender, Las Cruces, New Mexico,
(Stephen P. McCue, Federal Public Defender, and Shari Lynn Allison, Research
and Writing Specialist, with her on the brief), for Defendant-Appellee, Peter Paul
Hudson.

Richard B. McClarkin, Albuquerque, New Mexico, counsel for Defendant-
Appellee, Tammy Mae Riness, joined the brief filed by Defendant-Appellee, Peter
Paul Hudson.

---

Before **KELLY** and **MURPHY,** Circuit Judges, and **COOK,**[*] District Judge.

---

**MURPHY**, Circuit Judge.

---

## I. INTRODUCTION

The United States appeals an order of the district court suppressing certain statements made by Peter Hudson and Tammy Riness to agents of the United States Border Patrol. The district court suppressed the statements on the ground that they were obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966). Upon review of the record and pertinent authorities, we conclude that Hudson and Riness were not in custody at the time they made the statements in question and that *Miranda*, therefore, does not apply. *See United States v. Perdue*, 8 F.3d 1455, 1463 (10th Cir. 1993) ("[T]wo requirements must be met before *Miranda* is applicable; the suspect must be in 'custody,' and the questioning must meet the legal definition of 'interrogation.'"). Accordingly, this court exercises jurisdiction pursuant to 18 U.S.C. § 3731 and **reverses** the district court's order of suppression.

---

[*]Honorable H. Dale Cook, Senior District Judge, United States District Court for the Northern District of Oklahoma, sitting by designation.

## II. BACKGROUND

*A. Factual Background*

This case arose out of a border stop at a fixed checkpoint in a remote, desert location near Orogrande, New Mexico. A truck with an attached flat-bed trailer carrying two vehicles approached the checkpoint at 8:30 p.m.; Hudson was driving the truck and Riness was in the passenger seat. As the truck pulled into the checkpoint, United States Border Patrol Agent Jose Burgueno noticed that Hudson had some paperwork in his hand, eventually identified as a bill of lading, and that Hudson began waving these papers out of the truck's window before the truck reached the inspection area.[1] At that same time, Burgueno recognized that the truck's license plate was the subject of a be-on-the-lookout report ("BOLO") concerning the possible transportation of narcotics.

Burgueno took the bill of lading into the checkpoint trailer to review it under better lighting conditions. After further reviewing the bill of lading and discussing the BOLO with Agent Kevin Jensen, Burgueno decided further inspection of the truck was necessary. When Burgueno returned to the truck, he noticed that traffic was backing up in the primary inspection area. Accordingly,

---

[1]Burgueno testified as follows: (1) Hudson appeared to be nervous and his hands were shaking as he handed over the bill of lading; and (2) the bill of lading was unusual because it was handwritten in pen or pencil rather than being typed. The district court specifically found this testimony not credible.

Burgueno asked Hudson to drive the truck into the secondary inspection area. At that point, the truck had been in the primary inspection area for no more than two minutes. Burgueno did not return the bill of lading to Hudson. In fact, Burgueno testified that because of the BOLO and other suspicious circumstances, he did not intend to let Hudson and Riness leave the checkpoint until the agents had conducted an inspection of the truck and trailer.[2]

Burgueno and Jensen approached the truck at the secondary inspection area and Burgueno asked Hudson for consent to conduct a canine inspection of the truck and attached trailer. Hudson responded, "No problem." It is uncontested that in asking for consent, neither agent spoke in a harsh manner or made any threatening gestures. After Hudson gave his consent to the canine search, Burgueno asked Hudson and Riness if they would exit the truck during the search.

---

[2]Burgueno testified as follows at the suppression hearing:

Q. Now, when Mr. Hudson's truck entered the checkpoint, you had some reason to believe that there were drugs [present]?
A. I had previous knowledge, yes.
. . . .
Q. How did you have that knowledge, sir?
A. Through a be-on-the-lookout report that we had.
Q. Okay. So you didn't necessarily need the dog sniff. You had enough knowledge at that point to investigate?
A. We like to build our own probable cause.
Q. But Mr. Hudson and Ms. Riness would not be allowed to leave that checkpoint until you found probable cause, would they?
A. With the information that we had, we could build our own probable cause. If we had it, then we would just detain them for further investigation.

Hudson and Riness agreed to exit the truck and, after doing so, followed Jensen to an area adjacent to the secondary inspection and behind a brick or concrete barrier. Jensen testified that removal to the area behind the barrier was typical procedure used to obviate the danger associated with vehicles proceeding through the relatively small secondary inspection area. Jensen did not, however, inform Hudson or Riness that they were moved behind the barrier for their own safety.

As Jensen escorted Hudson and Riness to the area behind the barrier, Burgueno went to inform the Border Patrol canine handler, Agent Ken Jorgensen, that he had obtained consent to conduct a canine inspection of Hudson's truck and trailer. Because Jorgensen was performing a search of another vehicle, he was not immediately available to inspect Hudson's vehicle. In the interim, while all three were still standing behind the barrier, Jensen asked Hudson and Riness a series of questions over an eight-to-ten-minute period. In particular, Jensen asked Hudson and Riness where they were coming from, who they had been visiting, and where they were going.[3] A number of the responses given by Hudson and Riness are incriminating.[4] Jensen did not give Hudson or Riness *Miranda*

---

[3]The particular questions asked by Jensen, along with the answers given by Hudson and Riness are set out more fully below in the discussion of the district court's order of suppression. *See infra* Section II.B.

[4]At the suppression hearing, Jensen testified Hudson's and Riness' responses to his questions were frequently punctuated by long pauses and that Hudson and Riness often look up at each other before answering the questions.

(continued...)

-5-

warnings or inform them that they were free to ignore his questions. At the end of the questioning, Hudson and Riness, who were inappropriately dressed for the cold weather, were asked "if they would rather wait inside [the checkpoint trailer] where it was a lot warmer." Both agreed and accompanied Burgueno and Jensen into the trailer. Burgueno testified that at that point in time, Hudson and Riness were not placed under arrest, handcuffed, or placed in a cell.

Approximately three minutes after Hudson and Riness entered the checkpoint trailer, the dog alerted and border patrol agents discovered a large quantity of marijuana in one of the vehicles on the trailer. After discovering the marijuana, Burgueno and Jensen returned to the checkpoint trailer, placed Hudson and Riness under arrest, gave them *Miranda* warnings, handcuffed them, and placed them in a cell. A total of approximately fifteen minutes elapsed between the time Hudson and Riness first arrived at the checkpoint and the time of their arrest.

### B. District Court Ruling

After they were indicted on conspiracy and possession-with-intent-to-distribute charges relating to the marijuana found during the search of their truck, Hudson and Riness filed a motion to suppress the statements they made to Jensen

---

[4](...continued)
The district court specifically found that this testimony was not credible.

during the border stop. In the motion, Hudson and Riness argued that the statements were obtained through custodial interrogation without the benefit of *Miranda* warnings. In its response to the suppression motion, the United States argued as follows: (1) neither Hudson nor Riness were in custody at any point before they were informed the dog had alerted during its search of the truck, at which point they were formally placed under arrest and Mirandized; and (2) Jensen's questions were all within the scope of a routine encounter at a fixed border checkpoint as set forth in this court's decision in *United States v. Massie*, 65 F.3d 843 (10th Cir. 1995).[5]

After holding a hearing on the suppression motion, the district court granted the motion in part and denied it in part. In so doing, the district court separated Jensen's questions into two categories. The first category consisted of questions the district court found were used by the agents to "support their attempt to develop probable cause to make the BOLO hold up." The second

---

[5]In *United States v. Massie*, this court held that "[d]uring a routine fixed-checkpoint stop, border patrol agents may question individuals in the absence of individualized suspicion about their citizenship and immigration status and request documentation." 65 F.3d 843, 847-48 (10th Cir. 1995). Furthermore, "[a]gents may briefly question individuals concerning such things as vehicle ownership, cargo, destination, and travel plans, as long as such questions are reasonably related to the agent's duty to prevent the unauthorized entry of individuals into his country and to prevent the smuggling of contraband." *Id.* at 848 (citation and quotations omitted). Nevertheless, as a whole, the stop must remain brief, unintrusive, and must "not exceed the scope of a permissible routine checkpoint stop." *Id.* at 849.

category of questions were the type of "routine" questions "clearly contemplated" by *Massie*, "without any kind of [relationship to] probable cause." Utilizing these criteria, the district court suppressed all statements made in response to questions falling into the first category and refused to suppress any statements made in response to questions falling into the second category.

In a written order partially granting the motion to suppress, the district court supplemented its oral ruling, finding that the agents detained Hudson and Riness and "interrogated them with the intent of validating the unsubstantiated BOLO . . . they had received on the Defendants' vehicle." According to the district court, the "extended questioning, unrelated to the normal purposes of a referral to a secondary checkpoint and unsupported by reasonable suspicion, exceeded the scope of questioning allowed during a routine referral to a secondary checkpoint." The district court further concluded that at the time Hudson and Riness were questioned by Jensen, the situation had "ripened into a custodial interrogation" and that "a reasonable person in Defendants' position would believe his or her freedom had been curtailed to a degree associated with a formal arrest." According to the district court, the following factors supported a finding of custodial interrogation: Hudson and Riness "were removed from their vehicle, their documents had not been returned to them, and the agents were attempting to develop probable cause through pointed questioning."

Nevertheless, the district court only suppressed those statements it believed were made in response to questions specifically designed to develop probable cause.

In response to the district court's suppression order, the United States filed a motion to reconsider. After holding a telephonic hearing, the district court denied the government's motion. In so doing, the district court agreed that "the encounter was essentially consensual," but reiterated his conclusion that the agents had a "hidden agenda" by trying to develop probable cause based on the BOLO. Finally, the district clarified the specific statements it was excluding based on its review of the suppression hearing transcript. The district court allowed the following questions and answers:

> Q: [Agent Jensen] "Where are you all coming from?"
> A: [Hudson] "We're coming from El Paso."
> Q: [Agent Jensen] "Have you been down in El Paso for quite a while?"
> A: [Hudson] "Yes, quite a while."
> Q: [Agent Jensen] "How long have you been down in El Paso for?"
> A: [Hudson] "I've been down there for quite a while."
> Q: [Agent Jensen] "What are you all doing down in El Paso?"
> A: [Hudson] "We were visiting a friend."

The district court suppressed the following questions, holding that they "clearly go[] beyond the normal border stop":

> Q: [Agent Jensen] "Who was the gentleman you were visiting down in El Paso?"
> A: [Riness] "The name is Danny?"
> Q: [Agent Jensen] "What's Danny's last name?"
> A: [Hudson and Riness] "We don't know."

Q: [Agent Jensen] "Is Danny a very good friend of you all's?"
A: [Riness] I "Yes, he's a very good friend."
Q: [Agent Jensen] "It's very unusual that if Danny is such a good friend why you would not know his last name."
A: [No answer]

The district court then allowed the next question and answer:

Q: [Agent Jensen] "Who is the owner of the vehicles [on the trailer]?"
A: [Hudson] "I don't know."

The district court suppressed, however, the follow-up question and response:

Q: [Agent Jensen] "You're carrying the vehicles. You have a bill of lading. I thought you would have known who the owners of the vehicles were."
A: [Hudson] "I don't know."

The district court allowed the following clarification questions and responses:

Q: [Agent Jensen] "Well, since you don't know who the owners of the vehicles are, where did you pick them up at?"
A: [Hudson] "I picked them up in El Paso."
Q: [Agent Jensen] "Where in El Paso did you pick them up?"
A: [Hudson] "I can't remember."
Q: [Agent Jensen] "Well, are you getting paid for your services?"
A: [Hudson] "Yes."

The district court suppressed the following questions:

Q: [Agent Jensen] "How much are you getting paid?"
A: [Hudson] "I don't remember."
Q: [Agent Jensen] "So what you're saying is two people give you an undetermined amount of money at an undetermined location to transport two vehicles?"
A: [Hudson] "Yes."

The district court allowed the next question and answer:

-10-

Q: [Agent Jensen] "Where are you taking the vehicles to?"
A: [Hudson] "I'm taking them to Kansas City."

Finally, the district court suppressed a final series of follow-up questions, holding that Jensen was "pursuing his [BOLO] suspicions":

Q: [Agent Jensen] "Whereabouts are you taking them in Kansas City?"
A: [Riness] "We're taking them to the truck stop."
Q: [Agent Jensen] "There's only one truck stop in Kansas City?"
A: [Hudson] "Yes."
Q: [Agent Jensen] "When you arrive in Kansas City at this truck stop, the only truck stop in Kansas City, how are you going to make contact with the owners to let them know that you're there?"
A: [Hudson] "They'll just know."

### III. ANALYSIS

In reviewing a district court's ruling on a motion to suppress, this court accepts the district court's factual findings unless clearly erroneous and views the evidence in the light most favorable to the prevailing party. *See United States v. De La Cruz-Tapia*, 162 F. 3d 1275, 1277 (10th Cir. 1998). The district court specifically found that Hudson and Riness were in custody for purposes of *Miranda* and implicitly concluded that many of the questions Jensen asked Hudson and Riness were outside of the parameters of a routine border stop as set forth by this court in *Massie*. Both of these determinations involve questions of law subject to *de novo* review. *See United States v. Erving L.*, 147 F.3d 1240, 1246 (10th Cir. 1998) ("[W]e review the district court's ultimate 'in custody'

-11-

determination *de novo* . . . ."); *Massie*, 65 F.3d at 847 ("The ultimate question of whether a search and seizure was reasonable under the Fourth Amendment is a question of law that we review de novo." (quotation omitted)).

"It is well established that police officers are not required to administer *Miranda* warnings to everyone whom they question." *Erving L.*, 147 F.3d at 1246 (quotation omitted). Instead, *Miranda* only applies when an individual is subject to "custodial interrogation." *Miranda*, 384 U.S. at 444; *see also Perdue*, 8 F.3d at 1463. As to the question of custody, the Supreme Court has held that a person is not in custody for *Miranda* purposes unless his "freedom of action is curtailed to a degree associated with formal arrest." *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984) (quotation omitted). Furthermore, *Miranda*'s "in custody" requirement is measured objectively, the proper inquiry being whether "a reasonable [person] in the suspect's position would have understood his situation . . . as the functional equivalent of formal arrest." *Id.* at 442. Finally, "*Berkemer*'s 'reasonable person' does not have a guilty state of mind and does not have peculiar mental or emotional conditions that are not apparent to the questioning officer." *Erving L.*, 147 F.3d at 1247.

This court begins its analysis by noting that context is key in deciding whether Hudson and Riness were in custody during their encounter with Jensen.

The context here is the border.[6]  The Supreme Court has concluded that a stop at a fixed border checkpoint constitutes a Fourth Amendment seizure because a reasonable person would not believe she is free to leave.  *See United States v. Martinez-Fuerte*, 428 U.S. 543, 556 (1976).[7]  As noted by the Fifth Circuit, however, "a Fourth Amendment seizure does not necessarily render a person in custody for purposes of *Miranda*."  *United States v. Bengivenga*, 845 F.2d 593, 598 (5th Cir. 1988) (*en banc*).  For instance, the Supreme Court has specifically held that a traffic stop constitutes a Fourth Amendment seizure.  *See Delaware v. Prouse*, 440 U.S. 648, 653 (1979) ("[S]topping an automobile and detaining its occupants constitute a 'seizure' within the meaning of [the Fourth Amendment], even though the purpose of the stop is limited and the resulting detention quite brief.").  Such stops are not, however, necessarily custodial in the *Miranda* sense.  *Berkemer*, 468 U.S. at 440.

---

[6]Because of this unique context, we do not find this court's decision in *United States v. Griffin*, 7 F.3d 1512 (10th Cir. 1993), a case involving a *Terry* stop at an airport that ripened into custody, particularly helpful in determining whether Hudson and Riness were in custody during the series of questions posed by Jensen.  *Cf. United States v. Esquerra-Nunez*, No. 99-50458, 2000 WL 340134, at *1 (9th Cir. March 31, 2000) (unpublished disposition) ("Although the Ninth Circuit has identified a list of factors that should be considered in evaluating custody, those factors apply to non-border detentions, and have limited applicability at the border."  (citation omitted)).

[7]As long as the stop fits within the parameters established by this court in *Massie*, a seizure at the border is reasonable and consistent with the dictates of the Fourth Amendment.  *See Massie*, 65 F3d at 847-48.

A number of courts have recognized this important distinction in the context of a border stop and concluded that a routine stop at a fixed border checkpoint, although surely a Fourth Amendment seizure, is not custodial for *Miranda* purposes. *See United States v. Fernandez-Ventura*, 132 F.3d 844, 846 (1st Cir. 1998) ("In the context of Customs inspections, our assessment of whether an interrogation is custodial must take into account the strong governmental interest in controlling our borders. Questions from [Customs] officials are especially understood to be a necessary and important routine for travelers arriving at American entry points. This understanding cuts against the potentially coercive aspect of the Customs inquiry, and lessens the need for *Miranda* warnings." (quotation and citation omitted); *United States v. Moya*, 74 F.3d 1117, 1120 (11th Cir. 1996) ("[B]ecause of the sovereign's responsibility, some degree of questioning and of delay is necessary and is to be expected at entry points into the United States. Because of this expectation, questioning at the border must rise to a distinctly accusatory level before it can be said that a reasonable person would feel restraints on his ability to roam to the degree associated with formal arrest." (quotation omitted)); *Bengivenga*, 845 F.2d at 599 ("Routine citizenship checks at fixed checkpoints do not impose a degree of restraint associated with arrest because the detention is by nature brief and subject to the scrutiny of other travelers, the intrusion is limited in scope, advance notice

obtains and visible signs of authority mitigate rather than enhance the perceived degree of restraint."). This court agrees with these well-stated authorities that no reasonable person detained during a routine border stop could believe that her freedom was restrained to the degree associated with formal arrest. Thus, we conclude that a routine stop at a fixed border checkpoint, *i.e.*, a stop within the parameters set forth by this court in *Massie*, is not custodial and *Miranda* warnings are not necessary.[8]

The question then becomes whether the facts of this case take it outside of the *Massie* heartland and into the area of *Miranda* custody. We conclude that they do not. On appeal Hudson and Riness rely heavily on the fact that Jensen had an ulterior motive in asking many questions posed to them. That is, Jensen asked the questions in an attempt to substantiate the BOLO rather than in an effort to dissipate any suspicions arising purely out of the interactions at the checkpoint. The problem with such an approach is that it is directly contrary to the Supreme Court's holding in *Berkemer*, wherein the Court held that unrevealed subjective intent of law enforcement officers is irrelevant to the question of

---

[8]In so holding this court does not mean to suggest that every time a border stop evolves beyond the routine parameters set forth in *Massie* a custodial situation is created. *See United States v. Moya*, 74 F.3d 1117, 1120 (11th Cir. 1996) ("We stress that events which might be enough often to signal 'custody' away from the border will not be enough to establish 'custody' in the context of entry into the country."). Instead, we simply hold that a border stop characterized by the routine characteristics discussed in *Massie* is never custodial.

custody. *See Berkemer*, 468 U.S. at 442 ("A policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable [person] in the suspect's position would have understood his situation."). Accordingly, the district court erred in basing its custody determination on Jensen's unstated ulterior motives. *See United States v. Ozuna*, 170 F.3d 654, 658 (6th Cir. 1999) (holding, in border context, that "[b]ecause [the in custody determination] is an objective inquiry, the subjective beliefs of the interrogating officers or the person being interrogated are irrelevant"). Alternatively, to the extent the district court's order could be read to stand for the proposition that Hudson and Riness were in custody because the BOLO gave Jensen probable cause to arrest, that conclusion is similarly at odds with Supreme Court precedent. *See Berkemer*, 468 U.S. at 435 n.22.[9]

Having stripped away the overlay of Jensen's subjective motivations, it is clear that none of the questions posed by Jensen to Hudson and Riness were

---

[9]The *Berkemer* court noted as follows:

The threat to a citizen's Fifth Amendment rights that *Miranda* was designed to neutralize has little to do with the strength of an interrogating officer's suspicions. And, by requiring a policeman conversing with a motorist constantly to monitor the information available to him to determine when it becomes sufficient to establish probable cause, the [proposed rule] would be extremely difficult to administer.

*Berkemer v. McCarty*, 468 U.S. 420, 435 n.22 (1984); *see also United States v. Bengivenga*, 845 F.2d 593, 596 (5th Cir. 1988) (*en banc*) (noting *Berkemer* rule and applying it in border-stop context).

outside of the parameters of *Massie*. All of the questions concerned "such things as vehicle ownership, cargo, destination, and travel plans," and were reasonably related to the agent's duty . . . to prevent the smuggling of contraband." *Massie*, 65 F.3d at 848 (quotation omitted). Furthermore, none of the questions were so "distinctly accusatory" as to convert the encounter into custody. *See Moya*, 74 F.3d at 1120. The questions were asked over a relatively brief ten-minute time period and the entire encounter prior to arrest lasted no more than fifteen minutes. *See id.* (holding that "some degree of questioning and of delay is necessary and is to be expected" at the border). Finally, the questioning took place while agents waited to conduct a canine search of Hudson's and Riness' vehicle, a search as to which they had specifically consented. In sum, this court finds nothing about the series of questions asked by Jensen that would lead a reasonable person in Hudson's and Riness' position to feel that her freedom of movement had been curtailed to a degree associated with formal arrest. *See Berkemer*, 468 U.S. at 442.

This court reaches the same conclusion even when the series of questions is viewed together with the fact that Hudson and Riness were asked to exit their vehicle during the canine search and that the bill of lading was not returned to Hudson. As noted above, there is no question that Hudson and Riness were seized. The real question then becomes whether these two factors, considered in

the context of the totality of the circumstances, altered the circumstances of the border stop in a manner to take it outside of the parameters of *Massie*. We note that none of the agents involved in this case ever spoke to Hudson and Riness in a harsh or threatening manner or made any show of force. Hudson and Riness voluntarily left their vehicle and consented to the canine search. Hudson and Riness were never separated from each other, were never placed in handcuffs or a holding cell, and were never told they were under arrest. Although it was clear that they would be unable to leave because of the pendency of the canine search, they had specifically consented to the search. Accordingly, the agents' failure to return the bill of lading at the time the questioning occurred is completely unremarkable. Considered against the totality of the circumstances in this case, none of the factors identified by the district court take this case outside of the *Massie* heartland.

## IV. CONCLUSION

Upon *de novo* review, and with proper deference to the district court's findings of fact and credibility determinations, we conclude that a reasonable person in the position of Hudson and Riness would not have believed that she was subject to the functional equivalent of formal arrest. Accordingly, the district

court's order of suppression is hereby **REVERSED** and the case is **REMANDED** to the district court for further proceedings consistent with this opinion.