**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**May 3, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

N.J.Y. (a juvenile),

Defendant - Appellant.

No. 05-8064

(D. Wyoming)

(D.C. No. 05-CR-35-02-D)

**ORDER AND JUDGMENT**[*]

Before **TACHA,** Chief Circuit Judge, **ANDERSON** and **BALDOCK**, Circuit Judges.

After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of this appeal. See Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

N.J.Y., a juvenile, was adjudged delinquent under 18 U.S.C. §§ 5032 and 5037 by having committed sexual abuse and aiding and abetting sexual abuse, which acts would have been crimes in violation of 18 U.S.C. §§ 2, 1153, and 2242(2)(A).  He was sentenced to probation until his twenty-first birthday and ordered to remain at a juvenile residential treatment facility where he would undergo sexual offender and substance abuse treatment for an indefinite term not to exceed his twenty-first birthday.  He appeals his adjudication.  For the reasons set forth below, we affirm.

## BACKGROUND

N.J.Y. was charged by information in February 2005 under the Federal Juvenile Delinquency Act ("FJDA"), 18 U.S.C. §§ 5031-5042, based on conduct that had allegedly occurred in September 2003, when N.J.Y. was fourteen years old.  He filed a motion to suppress oral and written statements that he had given to Federal Bureau of Investigation ("FBI") and local law enforcement agents two days after the incident, when the agents visited the residence where N.J.Y. was living with his aunt.  He argued in this motion that the statements were obtained in violation of the Fifth Amendment because he had not received the warnings dictated by Miranda v. Arizona, 384 U.S. 436 (1966), prior to being questioned and because the statements were not voluntary.  He also filed a demand for a jury

trial, arguing that the rule that the right to a jury trial does not apply to juvenile delinquency proceedings is no longer valid in light of the Supreme Court's renewed emphasis on the Sixth Amendment as evidenced in the line of cases culminating in United States v. Booker, 543 U.S. 220 (2005).

Following a hearing on the suppression issue, the district court made the following oral findings of fact:

> [T]he two officers arrived at the residence where [N.J.Y.] was located, unannounced. The . . . officers did speak with [N.J.Y.'s aunt] who called [N.J.Y.] to the front door. Officers indicate[d] that they c[ould] interview inside the house or inside the[ir] vehicle but expressed their preference to do the interview in the vehicle because the officers' experience is that juveniles can often speak more freely outside the hearing of an adult and their family. [The aunt] indicate[d] it's okay to interview him in the vehicle, and [N.J.Y.] agreed to be interviewed.
>
> [N.J.Y.] sat in the front seat with [the FBI agent] in the driver's seat, and [the local agent] at some point got in behind him after speaking with [the aunt]. [The FBI agent] tells [N.J.Y.] he does not have to answer questions; he can open the car door from the inside and leave; he can stop the interview at any time; he's not under arrest and won't be arrested at the end of the interview and that the agents only want to hear the truth. The agents' weapons are not visible, although a rifle is hung in the back of the SUV.
>
> At some point in time, [the aunt] came out of the house, got in her car and left, apparently to go to the post office.
>
> [The FBI agent] asked [N.J.Y.] to tell his side of the story regarding the incident. [The FBI agent] tells [N.J.Y.], after he gives his story, that he doesn't believe him. [N.J.Y.] admits he knows more, and the agent asks him to tell his story again. Again, he tells a story, and again the officer tells him he doesn't believe it to be

truthful.  The agent discusses telling the truth, and he tells [N.J.Y.] that he thinks he's doing himself more harm by not telling the truth.

[N.J.Y.] gets out of the vehicle, leaves the door open, goes back to his own house, leaves the front door of the house open.  [The FBI agent] follows him to the house threshold and yells into the home, telling him his view that [N.J.Y.]'s story is inconsistent with the medical evidence that indicates that [the alleged victim] was involved in a sexual activity, and it may have been non-consensual and that he again expressed his view that [N.J.Y.] was not being truthful.

[N.J.Y.] exited the house and got back into the [agents'] vehicle.  At some point in time during the interview, he admitted having sexual intercourse with [the alleged victim].  [The FBI agent] asks if they can take a written statement; and he, during the course of the interview of [N.J.Y.], created [the] [e]xhibit . . . which was the statement written in the hand of [the FBI agent].  At the end of the statement in print are the words "I have R-E-D-I-N-G that," something crossed out and the initials "NJY," then the word "statement," and "I G-E-I-N W-E-N-T it."  And in parentheses [the FBI agent] writes underneath those words "agree with."  And there is again the initials of "NJY" underneath "agree with" and to the right of it.  The statement is witnessed by both [the FBI agent] and [the local agent], a two-page statement.

The testimony in this case . . . has indicated that [N.J.Y.] currently operates at a sixth- or seventh- grade level.  Earlier testing had him operating at the reading level of a second-grader.

Tr. of Bench Trial at 891-93, R. Vol. VIII (sealed).  After issuing these findings, the district court denied N.J.Y.'s motion to suppress, holding that Miranda did not apply because N.J.Y. was not in custody at the time he made the statements and that N.J.Y. made the statements voluntarily.  The district court also denied N.J.Y.'s demand for a jury trial.

Following a bench trial, the district court adjudged N.J.Y. to be a juvenile delinquent, as indicated above. On appeal, N.J.Y. challenges the district court's rulings on the suppression and jury trial issues.

## DISCUSSION

### I.     Motion to Suppress

In asserting that the statements described above should have been suppressed, N.J.Y. renews the arguments he made below concerning the agents' failure to give Miranda warnings and the involuntariness of the statements. In our review of these issues, "this court accepts the district court's factual findings unless clearly erroneous and views the evidence in the light most favorable to the prevailing party." United States v. Erving L., 147 F.3d 1240, 1242 (10th Cir. 1998).

### A.     Miranda warnings

It is undisputed in this case that the agents did not give N.J.Y. Miranda warnings before they questioned him. However, Miranda warnings are only required "when an individual is subject to 'custodial interrogation.'" United States v. Hudson, 210 F.3d 1184, 1190 (10th Cir. 2000) (quoting Miranda, 384 U.S. at 444). The district court's conclusion that N.J.Y. was not "in custody" for purposes of Miranda is reviewed de novo. Erving L., 147 F.3d at 1246. In

performing this review, we must determine whether a reasonable person in N.J.Y.'s position "'would have understood his situation . . . as the functional equivalent of formal arrest.'" Hudson, 210 F.3d at 1190 (quoting Berkemer v. McCarty, 468 U.S. 420, 442 (1984)); see Yarborough v. Alvarado, 541 U.S. 652, 662 (2004) ("[C]ustody must be determined based on how a reasonable person in the suspect's situation would perceive his circumstances."); see also Erving L., 147 F.3d at 1248 (applying standard of "a reasonable juvenile").

N.J.Y. does not argue that he was "in custody" during the agents' initial questioning but asserts that the questioning became custodial after he left the agents' vehicle, was followed to his home by the FBI agent, was told by the agent that his story so far was inconsistent with the medical evidence, and returned to the vehicle. According to N.J.Y., these circumstances "would have caused a 'reasonable' fourteen[-]year-old to believe that he was not free to leave and that he was required to answer further questions." Appellant's Br. at 29 (sealed). N.J.Y. also points to expert testimony of a psychologist that was offered during the evidentiary hearing below. The expert stated that based on his examination of N.J.Y., he "believe[d] that [N.J.Y.] didn't perceive a realistic choice" in regard to whether he had to return to the agents' vehicle because "the mechanism that [the FBI agent] had given [N.J.Y.] to interrupt the interview was to leave the vehicle, which [N.J.Y.] exercised; and at that point the interview was not terminated, but

instead [the FBI agent] followed [N.J.Y.] to the home." Tr. of Bench Trial at 773, R. Vol. VII (sealed).

Based on our careful review of the record, we do not agree that a reasonable juvenile in N.J.Y.'s position would have believed himself to be in the functional equivalent of a formal arrest at the point he returned to the agents' vehicle. Although the agents did not leave when N.J.Y. exited the vehicle the first time, the FBI agent's further statements to N.J.Y. at the threshold of his home were in the manner of attempting to persuade N.J.Y. that it was in his best interests to return to the car and tell the truth and did not appear to change the environment in which the interrogation was taking place. Specifically, the FBI agent testified that

> [b]asically my message at that point in time was that I had crystal clear evidence from a doctor that [the alleged victim] had been involved in sexual activity the previous Saturday night and that it was very likely that that sexual activity may have been non-consensual or even rise to the level of a sexual assault and that I felt that [N.J.Y.] had . . . not helped himself any by telling me the stories he had told me.

Id. at 608, R. Vol. VI. According to the agent, after he "continued to relate that same message," N.J.Y. "agreed to come back and continue the interview." Id. at 609. Moreover, as indicated by the district court's findings, which are not clearly erroneous, the agents clearly stated to N.J.Y. at the outset that he was free to leave and would not be arrested. The FBI agent further testified that he told

N.J.Y. that these "ground rules" still applied when they returned to the vehicle. Id. at 697, 701, R. Vol. VII. We therefore conclude that N.J.Y. was not in custody for purposes of Miranda and that the agents therefore were not required to give him Miranda warnings.

### B. Voluntariness

As stated, N.J.Y. also asserts that, regardless of Miranda's applicability, his statements to the agents should have been suppressed as involuntary. In reviewing the district court's conclusion to the contrary, we must "examine the entire record and make an independent determination of the ultimate issue of voluntariness." Erving L., 147 F.3d at 1248 (internal quotation omitted). This determination rests on "whether, considering the totality of the circumstances, the government obtained the statements by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." Id. at 1248-49; see also United States v. Toles, 297 F.3d 959, 965 (10th Cir. 2002).

In particular, we examine "both the characteristics of the accused and the details of the interrogation," including "(1) the age, intelligence, and education of the defendant; (2) the length of detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of his constitutional rights; and (5) whether the defendant was subject to physical punishment." United States v. Lopez, 437 F.3d 1059, 1063-64 (10th Cir. 2006) (internal quotation omitted).

The government bears the burden of proving voluntariness by a preponderance of the evidence. Id. at 1063 (citing Missouri v. Seibert, 542 U.S. 600, 608 n.1 (2004)). However, in order for suppression of statements to be appropriate, there must be some evidence of coercion, either through physical force or through some other form of manipulation. See Erving L., 147 F.3d at 1251 (holding confession by thirteen-year-old voluntary where "none of the actions of the officers were coercive"); United States v. Guerro, 983 F.2d 1001, 1004 (10th Cir. 1993) ("[T]o find a statement involuntary, the police must somehow overreach by exploiting a weakness or condition known to exist.").

N.J.Y. points to the following in support of his claim that his statements were involuntary: that he was fourteen years old at the time of the interrogation; that he had a "reduced intellectual ability"; that the questioning occurred in the agents' car; that his parents or legal guardian were not present; that "the questioning took approximately two hours and N.J.Y. was never fully advised of his constitutional rights"; that the FBI agent followed him after he left the vehicle "and induced him to reenter"; and that the FBI agent accused N.J.Y. of not telling the truth. Appellant's Br. at 25-26.

We recognize that "admissions and confessions of juveniles require special caution." In re Gault, 387 U.S. 1, 45 (1967); see also A.M. v. Butler, 360 F.3d 787, 800 (7th Cir. 2004). However, as stated above, N.J.Y. was not in custody

during his questioning. Although no parent or guardian was present, the questioning took place in a vehicle a short distance away from his home, and he was told he was free to leave at any time and at one point did so. While the FBI agent testified that the entire interrogation lasted between one and one-half to two hours, he stated that most of this time was spent composing N.J.Y.'s written statement after he had admitted having sexual contact with the alleged victim. Tr. of Bench Trial at 890, R. Vol. VIII (sealed). The record does not indicate that the agents pressed for a particular story from N.J.Y. but that they repeatedly told him they wanted the truth. Under these circumstances, the agents' assertions at several points during the initial interview that N.J.Y. was not telling the truth, and that his story was inconsistent with medical evidence, did not amount to coercion. Moreover, though the FBI agent wrote N.J.Y.'s written statement after N.J.Y. indicated he could not write well, there is no indication that the agents were aware that N.J.Y. had a "reduced intellectual ability" or made efforts to exploit any such reduced ability.

Thus, based on our review of the totality of the circumstances as indicated by the record and the district court's findings, we cannot conclude that the agents engaged in any form of coercion, either through force or through manipulation of N.J.Y.'s youth or other personal characteristics. We therefore affirm the district court's ruling that N.J.Y.'s statements were voluntary.

Accordingly, we affirm the district court's denial of N.J.Y.'s motion to suppress.

## II.    Jury Trial

In regard to N.J.Y.'s demand for a jury trial, N.J.Y. acknowledges that it is established law in this circuit that juveniles are not entitled to a jury trial in delinquency proceedings conducted pursuant to the FJDA.  See McKeiver v. Pennsylvania, 403 U.S. 528, 550 (1971) (rejecting right to jury trial in state court juvenile proceedings); United States v. Duboise, 604 F.2d 648, 652 (10th Cir. 1979) (rejecting right to jury trial in FJDA proceedings); see also United States v. Brian N., 900 F.2d 218, 220 (10th Cir. 1990) (explaining that FJDA proceedings "result[] in an adjudication of status—not a criminal conviction" and that the purpose of such proceedings "is to remove juveniles from the ordinary criminal process in order to avoid the stigma of a prior criminal conviction and to encourage treatment and rehabilitation").  However, N.J.Y. contends that "[t]he continuing validity of [these cases] is questionable given the U.S. Supreme Court's recent emphasis on a defendant's right to a jury" in Booker and the line of cases preceding it.  Appellant's Br. at 34.

The cases to which N.J.Y. refers concern the requirement that a jury make all factual findings that serve to increase a criminal defendant's sentence under a

mandatory sentencing scheme. See, e.g., Booker, 543 U.S. at 244. We do not perceive a direct connection between the Supreme Court's rulings in those cases and the right to a jury trial in noncriminal juvenile delinquency proceedings. We must therefore adhere to this circuit's precedent on the issue. See United States v. Brothers, 438 F.3d 1068, 1074 (10th Cir. 2006). Accordingly, we affirm the district court's denial of a jury trial in this case.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.

ENTERED FOR THE COURT

Stephen H. Anderson
Circuit Judge