HOLMES, J.,
concurring.
The defendant-appellant, Adan Sanchez-Gallegos, was indicted on one count of conspiracy to transport illegal aliens in violation of 8 U.S.C. § 1324(a)(l)(A)(ii). Prior to trial, Mr. Sanchez-Gallegos filed two motions to suppress — one seeking to suppress physical evidence found in his vehicle and on his person, and the other seeking to suppress the statements he made to law enforcement officers. The district court denied both motions, and a jury found Mr. Sanchez-Gallegos guilty of the charged conspiracy offense. Mr. Sanchez-Gallegos appeals his conviction, arguing, inter alia, that the district court erred in denying his motion to suppress his initial allegedly incriminatory statement to law enforcement. Exercising our jurisdiction pursuant to 28 U.S.C. § 1291, we AFFIRM his conviction.
BACKGROUND[1]
Around 1:00 p.m. on December 10, 2005, a Chevrolet Suburban vehicle bearing a California license plate pulled into a fixed Border Patrol checkpoint on 1-25 near Radium Springs, New Mexico. Border Patrol Agent Gonzalez was conducting primary inspections, and he approached the vehicle and introduced himself. He asked in English about the driver’s citizenship, to which the driver (later determined to be Mr. Sanchez-Gallegos) responded that he was a U.S. citizen. In conducting the primary inspection, Agent Gonzalez walked around the vehicle and noted the California license plate. Agent Gonzalez testified that, in his experience, it was unusual to see California license plates at an 1-25 checkpoint because they were more likely to be seen along the east-west corridor of 1-10. Agent Gonzalez returned to the driver and inquired about his travel plans. The driver had difficulty responding, so Agent Gonzalez switched to Spanish.[2] Agent Gonzalez repeated his initial inquiry about the driver’s citizenship, and this time the driver responded that he was a legal permanent resident from Mexico. Agent Gonzalez asked to see his immigration papers, and the driver provided a copy— rather than the original — of his Permanent Resident card, which identified him as Adan Sanchez-Gallegos. In response to questions about ownership of the vehicle and his travel plans, Mr. Sanchez-Gallegos explained that he had rented the Suburban, and that he was headed from Anthony, New Mexico, to Albuquerque, en route to Chicago. Agent Gonzalez testified that Mr. Sanchez-Gallegos appeared nervous during this encounter as he was avoiding eye contact, gripping the steering wheel, and talking in a nervous tone.
Agent Gonzalez asked for permission to inspect the vehicle further, and Mr. Sanchez-Gallegos gave his consent. Agent Gonzalez then had Mr. Sanchez-Gallegos move the Suburban to the secondary inspection area and confirmed that he had Mr. Sanchez-Gallegos’s consent to inspect the vehicle. At this point, another Border Patrol agent — a trained canine handler— approached the vehicle. Mr. Sanchez-Gallegos was asked to stand aside while the canine search was performed. Shortly thereafter, Agent Gonzalez was informed *60 that the canine had alerted to Mr. Sanchez-Gallegos’s vehicle.
Based on this alert, Agent Gonzalez asked Mr. Sanchez-Gallegos to come into the checkpoint office so that the vehicle could be inspected further. Before allowing him to enter the office, Agent Gonzalez asked Mr. Sanchez-Gallegos for permission to conduct a pat-down search of him as a safety precaution, and Mr. Sanchezs Gallegos consented to the search. While conducting this search, Agent Gonzalez felt a large bulge, which Mr. Sanchez-Gallegos explained was his money for purchasing a trailer or mobile home. Mr. Sanchez-Gallegos showed Agent Gonzalez the money ($7915 in United States currency plus 1800 Mexican Pesos).
Agent Gonzalez then “went back” to his “primary duties to conduct more immigration inspections while the [Border Patrol] agents inspected the vehicle.” R., Vol. Ill, at 28 (Suppression Hr’g Tr., dated Dec. 21, 2007). Agent Gonzalez subsequently asked for and received additional identification from Mr. Sanchez-Gallegos and busied himself “run[ning] checks” of Mr. Sanchez-Gallegos’s immigration and criminal histories. Id. at 25. The Border Patrol agents searching the interior of the Suburban discovered a duffle bag containing five Mexican birth certificates and a “Certificate of Good Conduct,” which is a document issued by the Mexican government.
Agent Gonzalez testified that upon discovering these documents, the agents were concerned that these documents belonged to six children who were being smuggled through the desert into the United States. Agent Gonzalez, with another Border Patrol agent observing, asked Mr. Sanchez-Gallegos about the source and purpose of the documents and the cash. Mr. Sanchez-Gallegos claimed that he was unaware of the documents and provided no further explanation for the cash.
Once the search of the vehicle was completed, Agent Gonzalez returned to Mr. Sanchez-Gallegos and expressed his suspicion that Mr. Sanchez-Gallegos was involved in smuggling children through the desert. In response, Mr. Sanchez-Gallegos informed Agent Gonzalez that “he had that money as part of a payment to take some children to ... Chicago.” Id. at 29. At the time that he gave this statement, Mr. Sanchez-Gallegos had been at the checkpoint for approximately forty to fifty minutes.
Following this admission, Agent Gonzalez and the other Border Patrol agent read Mr. Sanchez-Gallegos a Miranda warning in Spanish and presented an Advice of Rights form to him that was written in Spanish. Agent Gonzalez read the form aloud, and Mr. Sanchez-Gallegos signed the form. Mr. Sanchez-Gallegos then informed Agent Gonzalez that the children were not in the desert, but rather were in Albuquerque with “Victor.” Mr. Sanchez-Gallegos was to pick them up from “Victor” and transport them to their family in Chicago. Agent Gonzalez then called the duty agent with Immigration and Customs Enforcement (“ICE”), Agent Carroll, who was unable to come immediately to the checkpoint. However, Agent Carroll promised to arrange for an ICE agent from Albuquerque to call Agent Gonzalez.
At approximately 2:20 p.m., Agent Gonzalez received a call from Albuquerque ICE Agent Franco. Agent Franco asked Agent Gonzalez to see if Mr. Sanchez-Gonzalez would contact “Victor” in an effort to locate the children. He agreed to do so, and during this call, “Victor” explained that the children “were going to be at the Motel 6 near [the] Cesar Chavez exit on 1-25.” Id. at 36. Based on this information, Agent Gonzalez called the mo *61 tel and asked if a man had checked in with six children, but at that time, no one matching that description had checked in.
At approximately 4:80 p.m., Agent Carroll arrived at the checkpoint. He briefly discussed the situation with Agent Gonzalez, and then interviewed Mr. Sanchez-Gallegos after again obtaining a waiver of his Miranda rights. Mr. Sanchez-Gallegos explained that he had flown from Chicago to Albuquerque several days prior, rented the Suburban, and spent several days looking for a trailer or mobile home to purchase. After a day or two, he drove south to Anthony, New Mexico, where he met his friend, “Victor.” He took a day trip to Juarez, Mexico, and, while there, he received a phone call from “Victor” asking if he would smuggle some children, who were illegally present in the United States, from Albuquerque to Chicago, and he agreed to do so. Upon returning to Anthony, Mr. Sanchez-Gonzalez received the children’s documentation from “Victor,” then left Anthony on December 10, 2005, to pick up the children in Albuquerque.
Meanwhile, Agent Franco set up surveillance in Albuquerque on the Motel 6. At approximately 5:00 p.m., she received information that “Victor” had checked in with six children and three other adults. The agents knocked on the doors of his rooms. In one room, the agents found an adult male, later identified as Victor Manuel Cardoza-Avitia, Mr. Sanchez-Gallegos’s co-defendant; an adult female, later identified as Victor’s wife; and six children — the same children whose documentation had been seized from Mr. Sanchez-Gallegos’s luggage. Agent Franco then called Agent Carroll to tell him the children had been located. Subsequently, Mr. Sanchez-Gallegos was indicted for conspiracy to transport illegal aliens.
Mr. Sanchez-Gallegos filed two motions to suppress — one seeking to suppress the documents found in the Suburban and the cash found on his person, and the other seeking to suppress the statements he made to Agents Gonzalez and Carroll. Following a hearing, the district court denied both motions, finding that the agents had reasonable suspicion to direct Mr. Sanchez-Gallegos to the secondary inspection area, and probable cause to search the interior of his vehicle following the dog alert and the discovery of the cash on his person. The district court noted that Mr. Sanchez-Gallegos consented to the canine search. The district court found that Mr. Sanchez-Gallegos was not in custody when he made his initial incriminating statement, and his subsequent statements to Agents Gonzalez and Carroll were voluntarily and freely made after waiving his Miranda rights.
Following the district court’s denial of his motions to suppress, Mr. Sanchez-Gallegos proceeded to trial and was convicted of one count of conspiracy to transport illegal aliens. This timely appeal followed.
ANALYSIS
In his opening appellate brief, Mr. Sanchez-Gallegos argued that the district court erred by: (1) denying his motion to suppress the Mexican birth certificates found in his vehicle and the money found on his person; (2) denying his motion to suppress his initial allegedly incriminatory statement and his subsequent statements; (3) denying his motion to strike prejudicial surplusage from the superseding indictment; and (4) admitting a list of telephone numbers as a recorded recollection under Federal Rule of Evidence 803(5).
At oral argument, characterizing the other arguments as “silly” and “clutter,” *62 counsel for Mr. Sanchez-Gallegos[3] narrowed the contentions on appeal to a single “meritorious” issue — viz., whether the district court should have suppressed Mr. Sanchez-Gallegos’s first allegedly incriminatory statement[4] because law enforcement failed to inform Mr. Sanchez-Gallegos of his Miranda rights prior to questioning him. I appreciate defense counsel’s candor in winnowing the body of issues for our review. However, I ultimately conclude that the district court did not err in denying Mr. Sanchez-Gallegos’s motion to suppress his initial statement to Agent Gonzalez because Mr. Sanchez-Gallegos was not in custody when he made the statement and, therefore, Miranda did not apply. See United States v. Perdue, 8 F.3d 1455, 1463 (10th Cir.1993) (“[T]wo requirements must be met before Miranda is applicable; the suspect must be in ‘custody,’ and the questioning must meet the legal definition of ‘interrogation.’”); see also United States v. Hudson, 210 F.3d 1184, 1186, 1190-93 (10th Cir.2000) (discussing the impact of the unique context of a fixed border checkpoint on the analysis of the meaning of “custodial” under Miranda ).
“In considering a district court’s denial of a motion to suppress, this court reviews factual findings for clear error, viewing the evidence in the light most favorable to the government, and reviews legal conclusions de novo.” United States v. Carbajal-Iriarte, 586 F.3d 795, 799 (10th Cir.2009). In reviewing the district court’s decision, “[w]e are permitted to consider evidence introduced at the suppression hearing, as well as any evidence properly presented at trial.” United States v. Jones, 523 F.3d 1235, 1239 (10th Cir.2008) (alteration in original) (quoting United States v. Harris, 313 F.3d 1228, 1233 (10th Cir.2002)) (internal quotation marks omitted). “A finding is clearly erroneous only if no factual support can be found in the record or if it is obvious to this court that an error has occurred.” United States v. Burson, 531 F.3d 1254, 1256 (10th Cir.2008) (quoting United States v. Alexander, 447 F.3d 1290, 1293-94 (10th Cir.2006)) (internal quotation marks omitted). “The ultimate question of whether Miranda applies, however, is reviewed de novo,” Jones, 523 F.3d at 1239, because “[l]egal determinations, including ... whether a defendant was in custody, are reviewed de novo,” United States v. Lamy, 521 F.3d 1257, 1261 (10th Cir.2008).
“It is well established that police officers are not required to administer Miranda warnings to everyone whom they question.” United States v. Eckhart, 569 F.3d 1263, 1275 (10th Cir.2009) (quoting Hudson, 210 F.3d at 1190) (internal quotation marks omitted), cert. denied, — U.S. -, 130 S.Ct. 1752, 176 L.Ed.2d 222 (2010). “Instead, the protections set out by the Supreme Court in Miranda only apply when an individual is subject to custodial interrogation.” Id. (quoting United States v. Rogers, 391 F.3d 1165, 1169 (10th Cir.2004)) (internal quotation marks omitted). We have explained:
Whether a person is in custody for Miranda purposes depends on the type of the encounter with police. Of the three types of police-citizen encounters — voluntary cooperation, an investigatory detention under Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and a formal arrest — Miranda’s custody *63 element is triggered only in situations associated with formal arrests. In other words, “[c]ase law is well established that a defendant is not in custody under either of the first two encounters and therefore Miranda warnings need not usually be given.”
Jones, 523 F.3d at 1239 (alteration in original) (quoting United States v. Griffin, 7 F.3d 1512, 1516 (10th Cir.1993)).
The Supreme Court explained in Miranda that an individual is “in custody” if he is “deprived of his freedom of action in any significant way.” Miranda v. Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Determining whether Mr. Sanchez-Gallegos was in custody for Miranda purposes “flows from our seminal inquiry: ‘whether a reasonable person in [Mr. Sanehez-Gallegos’s] position would have understood [his] freedom of action to have been restricted to a degree consistent with formal arrest.’ ” Lamy, 521 F.3d at 1263 (second alteration in original) (quoting United States v. Revels, 510 F.3d 1269, 1275 (10th Cir.2007)). “We therefore must determine whether ‘a reasonable [person] in the suspect’s position would have understood [the] situation ... as the functional equivalent of formal arrest.’ ” United States v. Chee, 514 F.3d 1106, 1112 (10th Cir.2008) (alterations in original) (quoting Berkemer v. McCarty, 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)). A reasonable person “does not have a guilty state of mind and does not have peculiar mental or emotional conditions that are not apparent to the questioning officer.” Hudson, 210 F.3d at 1190 (quoting United States v. Erving L., 147 F.3d 1240, 1246 (10th Cir.1998)) (internal quotation marks omitted).
This is an objective, fact-intensive inquiry that focuses on the totality of the circumstances. See id.; see also Jones, 523 F.3d at 1239; Griffin, 7 F.3d at 1518. “We thus avoid hard line rules and instead allow several non-exhaustive factors to guide us.” Jones, 523 F.3d at 1240. The relevant factors include: “(1) whether the circumstances demonstrated a police-dominated atmosphere; (2) whether the nature and length of the officers’ questioning was accusatory or coercive; and (3) whether the police made [Mr. Sanchez-Gallegos] aware that [he] was free to refrain from answering questions, or to otherwise end the interview.” Revels, 510 F.3d at 1275.
Indications that an atmosphere is police-dominated
may include whether the suspect was separated from his family and isolated in a nonpublic questioning room, whether there was the threatening presence of several officers, whether there was any display of weapons or physical contact with the suspect, and whether the officer’s language and tone indicated that compliance might be compelled.
Chee, 514 F.3d at 1113 (citing Griffin, 7 F.3d at 1518-19).
“Although these factors are useful, we emphasize that we must look to the totality of the circumstances and consider the police-citizen encounter as a whole, rather than picking some facts and ignoring others.” Jones, 523 F.3d at 1240.
I also must emphasize that context is key in deciding whether Mr. Sanchez-Gallegos was in custody during his encounter with the Border Patrol agents. The context here is a fixed border checkpoint. As we explained in Hudson, “[t]he Supreme Court has concluded that a stop at a fixed border checkpoint constitutes a Fourth Amendment seizure because a reasonable person would not believe [he] is free to leave.”[5] 210 F.3d at 1190-91 (cit *64 ing United States v. Martinez-Fuerte, 428 U.S. 543, 556, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976)). However, “a Fourth Amendment seizure does not necessarily render a person in custody for purposes of Miranda.” Id. (quoting United States v. Bengivenga, 845 F.2d 593, 598 (5th Cir.1988) (en banc)) (internal quotation marks omitted). More specifically, a number of courts, including our own, have recognized the important distinction between a Fourth Amendment seizure and Miranda’s custody requirement, and have held that while a routine stop at a fixed border checkpoint may be a Fourth Amendment seizure, it is not custodial for Miranda purposes. Id. (citing United States v. Fernandez-Ventura, 132 F.3d 844, 846 (1st Cir.1998), and United States v. Moya, 74 F.3d 1117, 1120 (11th Cir.1996)).
The unique context of fixed border checkpoint stops is revealed by the different legal principles applicable to them. For example, “[a]t a fixed checkpoint, ... border patrol agents may stop, briefly detain, and question individuals without any individualized suspicion that the individuals are engaged in criminal activity.” Massie, 65 F.3d at 847; accord United States v. Forbes, 528 F.3d 1273, 1277-78 (10th Cir.2008) (discussing the “well-established principles applicable to border checkpoints and canine searches”). Such stops must be “brief and unintrusive” and the questioning “reasonably related” to the duties of the Border Patrol. Massie, 65 F.3d at 848. “Further detention of an individual beyond the scope of a routine checkpoint stop must be based upon reasonable suspicion, consent, or probable cause.” Id. However, “border patrol agents have virtually unlimited discretion to refer cars to the secondary inspections area,” Forbes, 528 F.3d at 1277 (quoting United States v. Sanders, 937 F.2d 1495, 1499 (10th Cir.1991)) (internal quotation marks omitted), and “may make such referrals without any particularized suspicion of criminal activity,” id.
In addition, agents are free to conduct canine searches at the border “so long as the vehicles and their occupants are otherwise lawfully detained at the time of the inspection.” Id. Canine inspections are permissible in the absence of individual suspicion and without the consent of the occupants of the vehicle. See Massie, 65 F.3d at 848; see also United States v. Williams, 403 F.3d 1203, 1207 (10th Cir.2005) (“A canine sniff on the exterior of a vehicle during a lawful traffic stop does not implicate legitimate privacy interests.”). Finally, a canine’s alert to the presence of contraband in a vehicle during its exterior sniff gives law enforcement officers probable cause to search the interior of the vehicle. See United States v. Rosborough, 366 F.3d 1145, 1152 (10th Cir.2004); United States v. Ludwig, 10 F.3d 1523, 1527-28 (10th Cir.1993).
In sum, “a routine stop at a fixed border checkpoint, i.e., a stop within the parameters set forth by this court in Massie ” and related cases, as outlined above, “is not custodial and Miranda warnings are not necessary.” Hudson, 210 F.3d at 1191. This rule of law is animated by our view that “no reasonable person detained during a routine border stop could believe that her freedom was restrained to the degree associated with formal arrest.” Id. Given the heightened security restrictions that the Sovereign routinely and necessarily enforces at fixed border checkpoints, “[w]e stress that events which might be enough often to signal ‘custody’ away from the border will not be enough to establish *65 ‘custody’ in the context of entry into the country.” Moya, 74 F.3d at 1120.
Mr. Sanchez-Gallegos contends that the district court erred in denying his motion to suppress the first statement that he made to Agent Gonzalez because he had not been advised of his Miranda rights at the time he made the statement. The government counters that no Miranda advisement was necessary because Mr. Sanchez-Gallegos’s interaction with the Border Patrol agents did not rise to the level of a custodial interrogation. I believe that the government has the better argument in this case.
Here, the district court properly concluded that Mr. Sanchez-Gallegos was not subjected to custodial interrogation. While Mr. Sanchez-Gallegos was not informed of his right to terminate the encounter, the nature of the pre-Miranda questioning was neither prolonged nor accusatory. See Jones, 523 F.3d at 1240 (explaining that prolonged and accusatory questioning can create a coercive environment); see also Hudson, 210 F.3d at 1191 (“[Questioning at the border must rise to a distinctly accusatory level before it can be said that a reasonable person would feel restraints on his ability to roam to the degree associated with formal arrest.” (quoting Moya, 74 F.3d at 1120) (internal quotation marks omitted)).
The exchange that prompted Mr. Sanchez-Gallegos’s first allegedly incriminatory statement was extremely brief. See Hudson, 210 F.3d at 1192 (noting that “[t]he questions were asked over a relatively brief ten-minute time period”); cf. Massie, 65 F.3d at 849 (“We further conclude the agents’ continued detention and questioning of Defendants did not exceed the confines of a routine checkpoint stop. The agents’ questioning lasted only eight to eleven minutes.... ”); United States v. Sukiz-Grado, 22 F.3d 1006, 1008-09 (10th Cir.1994) (“The questions that the agent asked Mr. Sukiz during his two-minute detention at the primary inspection area clearly fall within the ambit of routine inquiry or were justified by the suspicious circumstances observed by the agent.”).
Before Mr. Sanchez-Gallegos made his incriminating statement, Agent Gonzalez had explained that he was concerned that there were children attempting to circumvent the checkpoint by traveling through the desert. Agent Gonzalez asked Mr. Sanchez-Gallegos about the large amount of American and Mexican currency found in his pocket during the consensual pat-down search and the Mexican birth certificates found in his vehicle.[6] In response, Mr. Sanchez-Gallegos admitted that the money was “payment to take some children to ... Chicago.” R., Vol. Ill, at 29.
While it is true that Mr. Sanchez-Gallegos was removed from his vehicle and asked to wait in the Border Patrol checkpoint office, Mr. Sanchez-Gallegos consented to every progressive step in his encounter with Agent Gonzalez leading up to the questioning that elicited his allegedly incriminatory response. And there has *66 been no suggestion by Mr. Sanchez-Gallegos that this consent was coerced or illegally obtained. First, despite not needing Mr. Sanchez-Gallegos’s permission to refer him to the secondary checkpoint, see Forbes, 528 F.3d at 1277, Agent Gonzalez sought and received such permission before Mr. Sanehez-Gallegos moved his vehicle from the primary inspection area to the secondary inspection area. Second, again without needing permission, Agent Gonzalez sought and received Mr. Sanchez-Gallegos’s permission prior to having another Border Patrol Agent conduct an exterior canine sniff of the vehicle. See Williams, 403 F.3d at 1207; Massie, 65 F.3d at 848. Finally, Agent Gonzalez sought and received Mr. Sanchez-Gallegos’s permission to conduct a pat-down search before having him wait in the checkpoint office.
Moreover, the atmosphere cannot be described as police-dominated. See Chee, 514 F.3d at 1113; Griffin, 7 F.3d at 1518-19. Only two agents were present during the questioning. Mr. Sanehez-Gallegos was never placed in handcuffs. And he was never subjected to, nor threatened with, any physical mistreatment. See Eckhart, 569 F.3d at 1276 (explaining that Miranda warnings were not required where the defendant “was never handcuffed or placed in a police cruiser and no weapons were drawn ... [and] the officers were polite in their demeanor and did not use or threaten the use of force at any time”). Therefore, in the context of a fixed border checkpoint search, I do not believe that these circumstances, viewed in the totality, suggest that Mr. Sanchez-Gallegos was in custody. See Hudson, 210 F.3d at 1191 (concluding that defendants were not in custody under similar circumstances).[7]
To be sure, Mr. Sanehez-Gallegos had been at the checkpoint for as long as fifty minutes when he made the first allegedly incriminatory statement. However, this passage of time must be viewed in the context of (1) his consent, and (2) the fact that Mr. Sanehez-Gallegos was not questioned throughout this entire period. Mr. Sanehez-Gallegos consented to each governmental action that resulted in the delay. Furthermore, during a considerable portion of this time, Agent Gonzalez was either engaged in border-enforcement duties unrelated to Mr. Sanehez-Gallegos or was running criminal and immigration history checks related to Mr. Sanehez-Gallegos but not interrogating him. Mr. Sanchez-Gallegos’s first allegedly incrimi *67 natory statement came in response to a very brief period of questioning by Agent Gonzalez. Consequently, on the facts of this case, I do not believe that Massie’s limitation to a “brief’ period of questioning was contravened. Compare United States v. Chavira, 614 F.3d 127, 134 (5th Cir.2010) (“Under all these circumstances, thirty to forty minutes of increasingly accusatory questioning would indicate to the reasonable person in Chavira’s situation that her freedom had been restrained to the degree associated with formal arrest.”), with United States v. Harrell, 894 F.2d 120, 124 (5th Cir.1990) (“[W]e cannot say that a 60-75 minute interrogation is per se custodial, especially where the detainee offers the incriminating statements early in the detention. Some measure of investigatorial questioning is permissible without invoking Miranda concerns.”).
Mr. Sanchez-Gallegos was not in custody when he initially admitted to receiving money to transport children to Chicago because his freedom was not curtailed to the degree associated with a formal arrest. Therefore, in the context of a fixed border checkpoint search, and under the unique circumstances of this case — that included Mr. Sanchez-Gallegos’s repeated grants of consent which extended his encounter with law enforcement — Miranda warnings were not required. Thus, in my view, the district court did not err in denying the motion to suppress.

. We construe all facts in the light most favorable to the government as the prevailing party. United States v. Salazar, 609 F.3d 1059, 1063 (10th Cir.2010).

. The rest of Mr. Sanchez-Gallegos’s encounter with the Border Patrol agents was conducted in Spanish.

. A prior lawyer for Mr. Sanchez-Gallegos, and not his counsel who appeared at oral argument, prepared his opening appellate brief.

. This first allegedly incriminatory statement was that "he had that money as part of a payment to take some children to ... Chicago.” R„ Vol. Ill, at 29.

. As long as the border checkpoint stop comports with the requirements set out by this *64 court in United States v. Massie, 65 F.3d 843, 847-48 (10th Cir.1995), such a seizure is reasonable and consistent with the dictates of the Fourth Amendment.

. Agent Gonzalez explained at the suppression hearing that the following discussion prompted Mr. Sanchez-Gallegos's first allegedly incriminatory statement:
I asked him about all the inconsistencies that we had found, and I told him about the fact that he had lied to me about the travel plans, that he had told me he was a U.S. citizen, that he had all this money that he couldn’t explain to me how he got it, and that he had some birth certificates for children.
I told him that I believed there was a group of children walking around the checkpoint and that my concern was that, if they were, then they could be exposed to the elements and maybe, as I have seen before, die in the desert.
R„ Vol. Ill, at 28.

. Our analysis in Hudson is noteworthy:
This court reaches the same conclusion even when the series of questions is viewed together with the fact that Hudson and Riness were asked to exit their vehicle during the canine search and that the bill of lading was not returned to Hudson. As noted above, there is no question that Hudson and Riness were seized. The real question then becomes whether these two factors, considered in the context of the totality of the circumstances, altered the circumstances of the border stop in a manner to take it outside of the parameters of Massie. We note that none of the agents involved in this case ever spoke to Hudson and Riness in a harsh or threatening manner or made any show of force. Hudson and Riness voluntarily left their vehicle and consented to the canine search. Hudson and Riness were never separated from each other, were never placed in handcuffs or a holding cell, and were never told they were under arrest. Although it was clear that they would be unable to leave because of the pendency of the canine search, they had specifically consented to the search. Accordingly, the agents’ failure to return the bill of lading at the time the questioning occurred is completely unremarkable. Considered against the totality of the circumstances in this case, none of the factors identified by the district court take this case outside of the Massie heartland.
210 F.3d at 1192-93.