**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 4, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

ADAN SANCHEZ-GALLEGOS,

Defendant-Appellant.

No. 09-2146
(D.C. No. 1:07-CR-02053-WJ-1)
(D.N.M.)

**ORDER AND JUDGMENT**[*]

Before **BRISCOE**, Chief Judge, **EBEL** and **HOLMES**, Circuit Judges.

While each member of this panel provides different reasoning to reach the result, we affirm Mr. Sanchez-Gallegos's conviction. Both Judge Holmes and Chief Judge Briscoe conclude that the district court did not err in admitting Mr. Sanchez-Gallegos's initial un-Mirandized incriminating statement, reasoning that Miranda did not apply because Mr. Sanchez-Gallegos was not in custody when he made this statement. While Judge Holmes reasons that Mr. Sanchez-Gallegos was not in custody based on the totality of the circumstances considered in the context

---

[*] This Order and Judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Federal Rule of Appellate Procedure 32.1 and Tenth Circuit Rule 32.1.

of a routine fixed border checkpoint as established in <u>United States v. Massie</u>, 65 F.3d 843 (10th Cir. 1995), Chief Judge Briscoe concludes that the encounter with law enforcement exceeded the parameters of <u>Massie</u>.  Nonetheless, Chief Judge Briscoe reasons that Mr. Sanchez-Gallegos was not in custody based on the totality of the circumstances.  Judge Ebel concludes that the district court erred in admitting Mr. Sanchez-Gallegos's initial incriminating statement, reasoning that Mr. Sanchez-Gallegos was in custody when this statement was made based on the totality of the circumstances.  However, Judge Ebel reasons that this error was harmless because Mr. Sanchez-Gallegos's extensive and detailed post-<u>Miranda</u> statements were admissible and vastly outweighed the impact of the initial un-Mirandized incriminating statement.  Accordingly, for the foregoing reasons, we **AFFIRM** Mr. Sanchez-Gallegos's conviction.

ENTERED FOR THE COURT


PER CURIAM

09-2146, *United States v. Sanchez-Gallegos*

**HOLMES**, J., concurring.

The defendant-appellant, Adan Sanchez-Gallegos, was indicted on one count of conspiracy to transport illegal aliens in violation of 8 U.S.C. § 1324(a)(1)(A)(ii). Prior to trial, Mr. Sanchez-Gallegos filed two motions to suppress—one seeking to suppress physical evidence found in his vehicle and on his person, and the other seeking to suppress the statements he made to law enforcement officers. The district court denied both motions, and a jury found Mr. Sanchez-Gallegos guilty of the charged conspiracy offense. Mr. Sanchez-Gallegos appeals his conviction, arguing, *inter alia*, that the district court erred in denying his motion to suppress his initial allegedly incriminatory statement to law enforcement. Exercising our jurisdiction pursuant to 28 U.S.C. § 1291, we **AFFIRM** his conviction.

## BACKGROUND[1]

Around 1:00 p.m. on December 10, 2005, a Chevrolet Suburban vehicle bearing a California license plate pulled into a fixed Border Patrol checkpoint on I-25 near Radium Springs, New Mexico. Border Patrol Agent Gonzalez was conducting primary inspections, and he approached the vehicle and introduced himself. He asked in English about the driver's citizenship, to which the driver (later determined to be Mr. Sanchez-Gallegos) responded that he was a U.S.

---

[1]      We construe all facts in the light most favorable to the government as the prevailing party. *United States v. Salazar*, 609 F.3d 1059, 1063 (10th Cir. 2010).

citizen. In conducting the primary inspection, Agent Gonzalez walked around the vehicle and noted the California license plate. Agent Gonzalez testified that, in his experience, it was unusual to see California license plates at an I-25 checkpoint because they were more likely to be seen along the east-west corridor of I-10. Agent Gonzalez returned to the driver and inquired about his travel plans. The driver had difficulty responding, so Agent Gonzalez switched to Spanish.[2] Agent Gonzalez repeated his initial inquiry about the driver's citizenship, and this time the driver responded that he was a legal permanent resident from Mexico. Agent Gonzalez asked to see his immigration papers, and the driver provided a copy—rather than the original—of his Permanent Resident card, which identified him as Adan Sanchez-Gallegos. In response to questions about ownership of the vehicle and his travel plans, Mr. Sanchez-Gallegos explained that he had rented the Suburban, and that he was headed from Anthony, New Mexico, to Albuquerque, en route to Chicago. Agent Gonzalez testified that Mr. Sanchez-Gallegos appeared nervous during this encounter as he was avoiding eye contact, gripping the steering wheel, and talking in a nervous tone.

Agent Gonzalez asked for permission to inspect the vehicle further, and Mr. Sanchez-Gallegos gave his consent. Agent Gonzalez then had Mr. Sanchez-Gallegos move the Suburban to the secondary inspection area and

---

[2]     The rest of Mr. Sanchez-Gallegos's encounter with the Border Patrol agents was conducted in Spanish.

-2-

confirmed that he had Mr. Sanchez-Gallegos's consent to inspect the vehicle. At this point, another Border Patrol agent—a trained canine handler—approached the vehicle. Mr. Sanchez-Gallegos was asked to stand aside while the canine search was performed. Shortly thereafter, Agent Gonzalez was informed that the canine had alerted to Mr. Sanchez-Gallegos's vehicle.

Based on this alert, Agent Gonzalez asked Mr. Sanchez-Gallegos to come into the checkpoint office so that the vehicle could be inspected further. Before allowing him to enter the office, Agent Gonzalez asked Mr. Sanchez-Gallegos for permission to conduct a pat-down search of him as a safety precaution, and Mr. Sanchez-Gallegos consented to the search. While conducting this search, Agent Gonzalez felt a large bulge, which Mr. Sanchez-Gallegos explained was his money for purchasing a trailer or mobile home. Mr. Sanchez-Gallegos showed Agent Gonzalez the money ($7915 in United States currency plus 1800 Mexican Pesos).

Agent Gonzalez then "went back" to his "primary duties to conduct more immigration inspections while the [Border Patrol] agents inspected the vehicle." R., Vol. III, at 23 (Suppression Hr'g Tr., dated Dec. 21, 2007). Agent Gonzalez subsequently asked for and received additional identification from Mr. Sanchez-Gallegos and busied himself "run[ning] checks" of Mr. Sanchez-Gallegos's immigration and criminal histories. *Id.* at 25. The Border Patrol agents searching the interior of the Suburban discovered a duffle bag containing

five Mexican birth certificates and a "Certificate of Good Conduct," which is a document issued by the Mexican government.

Agent Gonzalez testified that upon discovering these documents, the agents were concerned that these documents belonged to six children who were being smuggled through the desert into the United States. Agent Gonzalez, with another Border Patrol agent observing, asked Mr. Sanchez-Gallegos about the source and purpose of the documents and the cash. Mr. Sanchez-Gallegos claimed that he was unaware of the documents and provided no further explanation for the cash.

Once the search of the vehicle was completed, Agent Gonzalez returned to Mr. Sanchez-Gallegos and expressed his suspicion that Mr. Sanchez-Gallegos was involved in smuggling children through the desert. In response, Mr. Sanchez-Gallegos informed Agent Gonzalez that "he had that money as part of a payment to take some children to . . . Chicago." *Id.* at 29. At the time that he gave this statement, Mr. Sanchez-Gallegos had been at the checkpoint for approximately forty to fifty minutes.

Following this admission, Agent Gonzalez and the other Border Patrol agent read Mr. Sanchez-Gallegos a *Miranda* warning in Spanish and presented an Advice of Rights form to him that was written in Spanish. Agent Gonzalez read the form aloud, and Mr. Sanchez-Gallegos signed the form. Mr. Sanchez-Gallegos then informed Agent Gonzalez that the children were not in the desert, but rather were in Albuquerque with "Victor." Mr. Sanchez-Gallegos was

-4-

to pick them up from "Victor" and transport them to their family in Chicago. Agent Gonzalez then called the duty agent with Immigration and Customs Enforcement ("ICE"), Agent Carroll, who was unable to come immediately to the checkpoint. However, Agent Carroll promised to arrange for an ICE agent from Albuquerque to call Agent Gonzalez.

At approximately 2:20 p.m., Agent Gonzalez received a call from Albuquerque ICE Agent Franco. Agent Franco asked Agent Gonzalez to see if Mr. Sanchez-Gonzalez would contact "Victor" in an effort to locate the children. He agreed to do so, and during this call, "Victor" explained that the children "were going to be at the Motel 6 near [the] Cesar Chavez exit on I-25." *Id.* at 36. Based on this information, Agent Gonzalez called the motel and asked if a man had checked in with six children, but at that time, no one matching that description had checked in.

At approximately 4:30 p.m., Agent Carroll arrived at the checkpoint. He briefly discussed the situation with Agent Gonzalez, and then interviewed Mr. Sanchez-Gallegos after again obtaining a waiver of his *Miranda* rights. Mr. Sanchez-Gallegos explained that he had flown from Chicago to Albuquerque several days prior, rented the Suburban, and spent several days looking for a trailer or mobile home to purchase. After a day or two, he drove south to Anthony, New Mexico, where he met his friend, "Victor." He took a day trip to Juarez, Mexico, and, while there, he received a phone call from "Victor" asking if

-5-

he would smuggle some children, who were illegally present in the United States, from Albuquerque to Chicago, and he agreed to do so. Upon returning to Anthony, Mr. Sanchez-Gonzalez received the children's documentation from "Victor," then left Anthony on December 10, 2005, to pick up the children in Albuquerque.

Meanwhile, Agent Franco set up surveillance in Albuquerque on the Motel 6. At approximately 5:00 p.m., she received information that "Victor" had checked in with six children and three other adults. The agents knocked on the doors of his rooms. In one room, the agents found an adult male, later identified as Victor Manuel Cardoza-Avitia, Mr. Sanchez-Gallegos's co-defendant; an adult female, later identified as Victor's wife; and six children—the same children whose documentation had been seized from Mr. Sanchez-Gallegos's luggage. Agent Franco then called Agent Carroll to tell him the children had been located. Subsequently, Mr. Sanchez-Gallegos was indicted for conspiracy to transport illegal aliens.

Mr. Sanchez-Gallegos filed two motions to suppress—one seeking to suppress the documents found in the Suburban and the cash found on his person, and the other seeking to suppress the statements he made to Agents Gonzalez and Carroll. Following a hearing, the district court denied both motions, finding that the agents had reasonable suspicion to direct Mr. Sanchez-Gallegos to the secondary inspection area, and probable cause to search the interior of his vehicle

following the dog alert and the discovery of the cash on his person. The district court noted that Mr. Sanchez-Gallegos consented to the canine search. The district court found that Mr. Sanchez-Gallegos was not in custody when he made his initial incriminating statement, and his subsequent statements to Agents Gonzalez and Carroll were voluntarily and freely made after waiving his *Miranda* rights.

Following the district court's denial of his motions to suppress, Mr. Sanchez-Gallegos proceeded to trial and was convicted of one count of conspiracy to transport illegal aliens. This timely appeal followed.

## ANALYSIS

In his opening appellate brief, Mr. Sanchez-Gallegos argued that the district court erred by: (1) denying his motion to suppress the Mexican birth certificates found in his vehicle and the money found on his person; (2) denying his motion to suppress his initial allegedly incriminatory statement and his subsequent statements; (3) denying his motion to strike prejudicial surplusage from the superseding indictment; and (4) admitting a list of telephone numbers as a recorded recollection under Federal Rule of Evidence 803(5).

At oral argument, characterizing the other arguments as "silly" and "clutter," counsel for Mr. Sanchez-Gallegos[3] narrowed the contentions on appeal

---

[3] A prior lawyer for Mr. Sanchez-Gallegos, and not his counsel who
(continued...)

-7-

to a single "meritorious" issue—*viz.*, whether the district court should have suppressed Mr. Sanchez-Gallegos's first allegedly incriminatory statement[4] because law enforcement failed to inform Mr. Sanchez-Gallegos of his *Miranda* rights prior to questioning him.  I appreciate defense counsel's candor in winnowing the body of issues for our review.  However, I ultimately conclude that the district court did not err in denying Mr. Sanchez-Gallegos's motion to suppress his initial statement to Agent Gonzalez because Mr. Sanchez-Gallegos was not in custody when he made the statement and, therefore, *Miranda* did not apply.  *See United States v. Perdue*, 8 F.3d 1455, 1463 (10th Cir. 1993) ("[T]wo requirements must be met before *Miranda* is applicable; the suspect must be in 'custody,' and the questioning must meet the legal definition of 'interrogation.'"); *see also United States v. Hudson*, 210 F.3d 1184, 1186, 1190–93 (10th Cir. 2000) (discussing the impact of the unique context of a fixed border checkpoint on the analysis of the meaning of "custodial" under *Miranda*).

"In considering a district court's denial of a motion to suppress, this court reviews factual findings for clear error, viewing the evidence in the light most favorable to the government, and reviews legal conclusions de novo."  *United*

---

[3](...continued)
appeared at oral argument, prepared his opening appellate brief.

[4]    This first allegedly incriminatory statement was that "he had that money as part of a payment to take some children to . . . Chicago."  R., Vol. III, at 29.

*States v. Carbajal-Iriarte*, 586 F.3d 795, 799 (10th Cir. 2009). In reviewing the district court's decision, "[w]e are permitted to consider evidence introduced at the suppression hearing, as well as any evidence properly presented at trial." *United States v. Jones*, 523 F.3d 1235, 1239 (10th Cir. 2008) (alteration in original) (quoting *United States v. Harris*, 313 F.3d 1228, 1233 (10th Cir. 2002)) (internal quotation marks omitted). "A finding is clearly erroneous only if no factual support can be found in the record or if it is obvious to this court that an error has occurred." *United States v. Burson*, 531 F.3d 1254, 1256 (10th Cir. 2008) (quoting *United States v. Alexander*, 447 F.3d 1290, 1293–94 (10th Cir. 2006)) (internal quotation marks omitted). "The ultimate question of whether *Miranda* applies, however, is reviewed de novo," *Jones*, 523 F.3d at 1239, because "[l]egal determinations, including . . . whether a defendant was in custody, are reviewed de novo," *United States v. Lamy*, 521 F.3d 1257, 1261 (10th Cir. 2008).

"It is well established that police officers are not required to administer *Miranda* warnings to everyone whom they question." *United States v. Eckhart*, 569 F.3d 1263, 1275 (10th Cir. 2009) (quoting *Hudson*, 210 F.3d at 1190) (internal quotation marks omitted), *cert. denied*, 130 S. Ct. 1752 (2010). "Instead, the protections set out by the Supreme Court in *Miranda* only apply when an individual is subject to custodial interrogation." *Id.* (quoting *United*

*States v. Rogers*, 391 F.3d 1165, 1169 (10th Cir. 2004)) (internal quotation marks

omitted).  We have explained:

> Whether a person is in custody for *Miranda* purposes depends on the type of the encounter with police.  Of the three types of police-citizen encounters—voluntary cooperation, an investigatory detention under *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), and a formal arrest—*Miranda*'s custody element is triggered only in situations associated with formal arrests.  In other words, "[c]ase law is well established that a defendant is not in custody under either of the first two encounters and therefore *Miranda* warnings need not usually be given."

*Jones*, 523 F.3d at 1239 (alteration in original) (quoting *United States v. Griffin*, 7

F.3d 1512, 1516 (10th Cir. 1993)).

The Supreme Court explained in *Miranda* that an individual is "in custody"

if he is "deprived of his freedom of action in any significant way."  *Miranda v.*

*Arizona*, 384 U.S. 436, 444 (1966).  Determining whether Mr. Sanchez-Gallegos

was in custody for *Miranda* purposes "flows from our seminal inquiry: 'whether a

reasonable person in [Mr. Sanchez-Gallegos's] position would have understood

[his] freedom of action to have been restricted to a degree consistent with formal

arrest.'"  *Lamy*, 521 F.3d at 1263 (second alteration in original) (quoting *United*

*States v. Revels*, 510 F.3d 1269, 1275 (10th Cir. 2007)).  "We therefore must

determine whether 'a reasonable [person] in the suspect's position would have

understood [the] situation . . . as the functional equivalent of formal arrest.'"

*United States v. Chee*, 514 F.3d 1106, 1112 (10th Cir. 2008) (alterations in

original) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984)).  A reasonable person "does not have a guilty state of mind and does not have peculiar mental or emotional conditions that are not apparent to the questioning officer." *Hudson*, 210 F.3d at 1190 (quoting *United States v. Erving L.*, 147 F.3d 1240, 1246 (10th Cir. 1998)) (internal quotation marks omitted).

This is an objective, fact-intensive inquiry that focuses on the totality of the circumstances.  *See id.*; *see also Jones*, 523 F.3d at 1239; *Griffin*, 7 F.3d at 1518.  "We thus avoid hard line rules and instead allow several non-exhaustive factors to guide us." *Jones*, 523 F.3d at 1240.  The relevant factors include: "(1) whether the circumstances demonstrated a police-dominated atmosphere; (2) whether the nature and length of the officers' questioning was accusatory or coercive; and (3) whether the police made [Mr. Sanchez-Gallegos] aware that [he] was free to refrain from answering questions, or to otherwise end the interview." *Revels*, 510 F.3d at 1275.

Indications that an atmosphere is police-dominated

> may include whether the suspect was separated from his family and isolated in a nonpublic questioning room, whether there was the threatening presence of several officers, whether there was any display of weapons or physical contact with the suspect, and whether the officer's language and tone indicated that compliance might be compelled.

*Chee*, 514 F.3d at 1113 (citing *Griffin*, 7 F.3d at 1518–19).

-11-

"Although these factors are useful, we emphasize that we must look to the totality of the circumstances and consider the police-citizen encounter as a whole, rather than picking some facts and ignoring others." *Jones*, 523 F.3d at 1240.

I also must emphasize that context is key in deciding whether Mr. Sanchez-Gallegos was in custody during his encounter with the Border Patrol agents. The context here is a fixed border checkpoint. As we explained in *Hudson*, "[t]he Supreme Court has concluded that a stop at a fixed border checkpoint constitutes a Fourth Amendment seizure because a reasonable person would not believe [he] is free to leave."[5] 210 F.3d at 1190–91 (citing *United States v. Martinez-Fuerte*, 428 U.S. 543, 556 (1976)). However, "a Fourth Amendment seizure does not necessarily render a person in custody for purposes of *Miranda*." *Id.* (quoting *United States v. Bengivenga*, 845 F.2d 593, 598 (5th Cir. 1988) (en banc)) (internal quotation marks omitted). More specifically, a number of courts, including our own, have recognized the important distinction between a Fourth Amendment seizure and *Miranda*'s custody requirement, and have held that while a routine stop at a fixed border checkpoint may be a Fourth Amendment seizure, it is not custodial for *Miranda* purposes. *Id.* (citing *United States v. Fernandez-*

---

[5] As long as the border checkpoint stop comports with the requirements set out by this court in *United States v. Massie*, 65 F.3d 843, 847–48 (10th Cir. 1995), such a seizure is reasonable and consistent with the dictates of the Fourth Amendment.

*Ventura*, 132 F.3d 844, 846 (1st Cir. 1998), and *United States v. Moya*, 74 F.3d 1117, 1120 (11th Cir. 1996)).

The unique context of fixed border checkpoint stops is revealed by the different legal principles applicable to them. For example, "[a]t a fixed checkpoint, . . . border patrol agents may stop, briefly detain, and question individuals without any individualized suspicion that the individuals are engaged in criminal activity." *Massie*, 65 F.3d at 847; *accord United States v. Forbes*, 528 F.3d 1273, 1277–78 (10th Cir. 2008) (discussing the "well-established principles applicable to border checkpoints and canine searches"). Such stops must be "brief and unintrusive" and the questioning "reasonably related" to the duties of the Border Patrol. *Massie*, 65 F.3d at 848. "Further detention of an individual beyond the scope of a routine checkpoint stop must be based upon reasonable suspicion, consent, or probable cause." *Id.* However, "border patrol agents have virtually unlimited discretion to refer cars to the secondary inspections area," *Forbes*, 528 F.3d at 1277 (quoting *United States v. Sanders*, 937 F.2d 1495, 1499 (10th Cir. 1991)) (internal quotation marks omitted), and "may make such referrals without any particularized suspicion of criminal activity," *id.*

In addition, agents are free to conduct canine searches at the border "so long as the vehicles and their occupants are otherwise lawfully detained at the time of the inspection." *Id.* Canine inspections are permissible in the absence of individual suspicion and without the consent of the occupants of the vehicle. *See*

-13-

*Massie*, 65 F.3d at 848; *see also United States v. Williams*, 403 F.3d 1203, 1207 (10th Cir. 2005) ("A canine sniff on the exterior of a vehicle during a lawful traffic stop does not implicate legitimate privacy interests."). Finally, a canine's alert to the presence of contraband in a vehicle during its exterior sniff gives law enforcement officers probable cause to search the interior of the vehicle. *See United States v. Rosborough*, 366 F.3d 1145, 1152 (10th Cir. 2004); *United States v. Ludwig*, 10 F.3d 1523, 1527–28 (10th Cir. 1993).

In sum, "a routine stop at a fixed border checkpoint, *i.e.*, a stop within the parameters set forth by this court in *Massie*" and related cases, as outlined above, "is not custodial and *Miranda* warnings are not necessary." *Hudson*, 210 F.3d at 1191. This rule of law is animated by our view that "no reasonable person detained during a routine border stop could believe that her freedom was restrained to the degree associated with formal arrest." *Id.* Given the heightened security restrictions that the Sovereign routinely and necessarily enforces at fixed border checkpoints, "[w]e stress that events which might be enough often to signal 'custody' away from the border will not be enough to establish 'custody' in the context of entry into the country." *Moya*, 74 F.3d at 1120.

Mr. Sanchez-Gallegos contends that the district court erred in denying his motion to suppress the first statement that he made to Agent Gonzalez because he had not been advised of his *Miranda* rights at the time he made the statement. The government counters that no *Miranda* advisement was necessary because Mr.

-14-

Sanchez-Gallegos's interaction with the Border Patrol agents did not rise to the level of a custodial interrogation. I believe that the government has the better argument in this case.

Here, the district court properly concluded that Mr. Sanchez-Gallegos was not subjected to custodial interrogation. While Mr. Sanchez-Gallegos was not informed of his right to terminate the encounter, the nature of the pre-*Miranda* questioning was neither prolonged nor accusatory. *See Jones*, 523 F.3d at 1240 (explaining that prolonged and accusatory questioning can create a coercive environment); *see also Hudson*, 210 F.3d at 1191 ("[Q]uestioning at the border must rise to a distinctly accusatory level before it can be said that a reasonable person would feel restraints on his ability to roam to the degree associated with formal arrest." (quoting *Moya*, 74 F.3d at 1120) (internal quotation marks omitted)).

The exchange that prompted Mr. Sanchez-Gallegos's first allegedly incriminatory statement was extremely brief. *See Hudson*, 210 F.3d at 1192 (noting that "[t]he questions were asked over a relatively brief ten-minute time period"); *cf. Massie*, 65 F.3d at 849 ("We further conclude the agents' continued detention and questioning of Defendants did not exceed the confines of a routine checkpoint stop. The agents' questioning lasted only eight to eleven minutes . . . ."); *United States v. Sukiz-Grado*, 22 F.3d 1006, 1008–09 (10th Cir. 1994) ("The questions that the agent asked Mr. Sukiz during his two-minute

detention at the primary inspection area clearly fall within the ambit of routine inquiry or were justified by the suspicious circumstances observed by the agent.").

Before Mr. Sanchez-Gallegos made his incriminating statement, Agent Gonzalez had explained that he was concerned that there were children attempting to circumvent the checkpoint by traveling through the desert. Agent Gonzalez asked Mr. Sanchez-Gallegos about the large amount of American and Mexican currency found in his pocket during the consensual pat-down search and the Mexican birth certificates found in his vehicle.[6] In response, Mr. Sanchez-Gallegos admitted that the money was "payment to take some children to . . . Chicago." R., Vol. III, at 29.

---

[6]     Agent Gonzalez explained at the suppression hearing that the following discussion prompted Mr. Sanchez-Gallegos's first allegedly incriminatory statement:

> I asked him about all the inconsistencies that we had found, and I told him about the fact that he had lied to me about the travel plans, that he had told me he was a U.S. citizen, that he had all this money that he couldn't explain to me how he got it, and that he had some birth certificates for children.
>       I told him that I believed there was a group of children walking around the checkpoint and that my concern was that, if they were, then they could be exposed to the elements and maybe, as I have seen before, die in the desert.

R., Vol. III, at 28.

While it is true that Mr. Sanchez-Gallegos was removed from his vehicle and asked to wait in the Border Patrol checkpoint office, Mr. Sanchez-Gallegos consented to every progressive step in his encounter with Agent Gonzalez leading up to the questioning that elicited his allegedly incriminatory response. And there has been no suggestion by Mr. Sanchez-Gallegos that this consent was coerced or illegally obtained. First, despite not needing Mr. Sanchez-Gallegos's permission to refer him to the secondary checkpoint, *see Forbes*, 528 F.3d at 1277, Agent Gonzalez sought and received such permission before Mr. Sanchez-Gallegos moved his vehicle from the primary inspection area to the secondary inspection area. Second, again without needing permission, Agent Gonzalez sought and received Mr. Sanchez-Gallegos's permission prior to having another Border Patrol Agent conduct an exterior canine sniff of the vehicle. *See Williams*, 403 F.3d at 1207; *Massie*, 65 F.3d at 848. Finally, Agent Gonzalez sought and received Mr. Sanchez-Gallegos's permission to conduct a pat-down search before having him wait in the checkpoint office.

Moreover, the atmosphere cannot be described as police-dominated. *See Chee*, 514 F.3d at 1113; *Griffin*, 7 F.3d at 1518–19. Only two agents were present during the questioning. Mr. Sanchez-Gallegos was never placed in handcuffs. And he was never subjected to, nor threatened with, any physical mistreatment. *See Eckhart*, 569 F.3d at 1276 (explaining that *Miranda* warnings were not required where the defendant "was never handcuffed or placed in a

police cruiser and no weapons were drawn . . . [and] the officers were polite in their demeanor and did not use or threaten the use of force at any time"). Therefore, in the context of a fixed border checkpoint search, I do not believe that these circumstances, viewed in the totality, suggest that Mr. Sanchez-Gallegos was in custody. *See Hudson*, 219 F.3d at 1191 (concluding that defendants were not in custody under similar circumstances).[7]

---

[7]     Our analysis in *Hudson* is noteworthy:

> This court reaches the same conclusion even when the series of questions is viewed together with the fact that Hudson and Riness were asked to exit their vehicle during the canine search and that the bill of lading was not returned to Hudson. As noted above, there is no question that Hudson and Riness were seized. The real question then becomes whether these two factors, considered in the context of the totality of the circumstances, altered the circumstances of the border stop in a manner to take it outside of the parameters of *Massie*. We note that none of the agents involved in this case ever spoke to Hudson and Riness in a harsh or threatening manner or made any show of force. Hudson and Riness voluntarily left their vehicle and consented to the canine search. Hudson and Riness were never separated from each other, were never placed in handcuffs or a holding cell, and were never told they were under arrest. Although it was clear that they would be unable to leave because of the pendency of the canine search, they had specifically consented to the search. Accordingly, the agents' failure to return the bill of lading at the time the questioning occurred is completely unremarkable. Considered against the totality of the circumstances in this case, none of the factors identified by the district court take this case outside of the *Massie* heartland.

210 F.3d at 1192–93.

To be sure, Mr. Sanchez-Gallegos had been at the checkpoint for as long as fifty minutes when he made the first allegedly incriminatory statement. However, this passage of time must be viewed in the context of (1) his consent, and (2) the fact that Mr. Sanchez-Gallegos was not questioned throughout this entire period. Mr. Sanchez-Gallegos consented to each governmental action that resulted in the delay. Furthermore, during a considerable portion of this time, Agent Gonzalez was either engaged in border-enforcement duties unrelated to Mr. Sanchez-Gallegos or was running criminal and immigration history checks related to Mr. Sanchez-Gallegos but not interrogating him. Mr. Sanchez-Gallegos's first allegedly incriminatory statement came in response to a very brief period of questioning by Agent Gonzalez. Consequently, on the facts of this case, I do not believe that *Massie*'s limitation to a "brief" period of questioning was contravened. *Compare United States v. Chavira*, 614 F.3d 127, 134 (5th Cir. 2010) ("Under all these circumstances, thirty to forty minutes of increasingly accusatory questioning would indicate to the reasonable person in Chavira's situation that her freedom had been restrained to the degree associated with formal arrest."), *with United States v. Harrell*, 894 F.2d 120, 124 (5th Cir. 1990) ("[W]e cannot say that a 60–75 minute interrogation is *per se* custodial, especially where the detainee offers the incriminating statements early in the detention. Some measure of investigatorial questioning is permissible without invoking *Miranda* concerns.").

Mr. Sanchez-Gallegos was not in custody when he initially admitted to receiving money to transport children to Chicago because his freedom was not curtailed to the degree associated with a formal arrest. Therefore, in the context of a fixed border checkpoint search, and under the unique circumstances of this case—that included Mr. Sanchez-Gallegos's repeated grants of consent which extended his encounter with law enforcement—*Miranda* warnings were not required. Thus, in my view, the district court did not err in denying the motion to suppress.

No. 09-2146, United States v. Sanchez-Gallegos

**BRISCOE,** Chief Judge, concurring:

I agree with the ultimate conclusion that Sanchez-Gallegos was not in custody when he made his initial incriminating statements and that Miranda, therefore, does not apply. Thus, I agree that the district court did not err in denying the motion to suppress these incriminating statements. However, in my view, Sanchez-Gallegos's encounter exceeded the parameters for a routine stop at a fixed border checkpoint established in United States v. Massie, 65 F.3d 843 (10th Cir. 1995). Nonetheless, I conclude that Sanchez-Gallegos was not in custody for purposes of Miranda based on the totality of the circumstances presented.

**I**

In United States v. Hudson, this court established that "a routine stop at a fixed border checkpoint, i.e., a stop within the parameters set forth by this court in Massie, is not custodial and Miranda warnings are not necessary." Hudson, 210 F.3d 1184, 1191 (10th Cir. 2000). Thus, the first question to address is "whether the facts of this case take it outside of the Massie heartland." Id. I conclude that Sanchez-Gallegos's encounter with the border patrol agents exceeded the Massie parameters for a routine stop at a fixed border checkpoint.

In Massie, this court defined a routine fixed border checkpoint stop as a "brief and unintrusive" encounter where "a border patrol agent may ask questions

reasonably related to his duties and explore suspicious circumstances." 65 F.3d at 848 (emphasis added). Further, without exceeding the confines of a routine fixed border checkpoint stop, an agent may direct individuals to a secondary checkpoint and can pursue inquiries at the secondary location regarding "vehicle ownership, cargo, destination, and travel plans, and . . . any suspicious circumstances . . . observed, as long as the detention remain[s] brief and unintrusive." Id. at 849 (internal quotation marks and citation omitted). Thus, in Massie, this court characterized as a routine checkpoint stop an encounter at a fixed border checkpoint involving inquiries that "lasted only eight to eleven minutes from the time Defendants were stopped at primary to the moment the dog alerted on the trunk" and that concerned "citizenship, vehicle ownership, vehicle contents, destination, and travel plans." Id.

Sanchez-Gallegos's stop at the fixed border checkpoint exceeded the Massie parameters due the length and intrusiveness of the encounter. Initially, the encounter began as a routine fixed border checkpoint stop. Specifically, the border patrol agents asked routine questions and referred Sanchez-Gallegos to the secondary checkpoint, where he consented to a canine search of his vehicle. See Hudson, 210 F.3d at 1192–93. However, after the dog alerted to the vehicle, Sanchez-Gallegos was asked to proceed to the secondary checkpoint office and he submitted to a consensual pat-down search for the agents' safety, which revealed approximately eight thousand dollars in his pocket. While Sanchez-Gallegos

-2-

waited in the secondary checkpoint office, border patrol agents searched the interior of his vehicle, uncovering six Mexican birth certificates. At this point, after Sanchez-Gallegos had been detained at the checkpoint for approximately forty to fifty minutes, the agents engaged in the questioning that elicited the incriminating statements at issue in this case. I conclude that this encounter necessarily extended beyond the confines of a brief, unintrusive detention as required in Massie for a routine stop at a fixed border checkpoint.

## II

Even though the encounter exceeded the parameters of Massie, this does not dictate the conclusion that Sanchez-Gallegos was in custody for purposes of Miranda. See Hudson, 210 F.3d at 1191 n.8 ("[T]his court does not mean to suggest that every time a border stop evolves beyond the routine parameters set forth in Massie a custodial situation is created."). Rather, this court must still consider the totality of the circumstances presented to determine "whether a reasonable person in [the suspect's] position would have understood [his] freedom of action to have been restricted to a degree consistent with formal arrest." United States v. Revels, 510 F.3d 1269, 1275 (10th Cir. 2007). This inquiry involves examination of the following non-exhaustive factors: "(1) whether the circumstances demonstrated a police-dominated atmosphere; (2) whether the nature and length of the officers' questioning was accusatory or coercive; and (3)

-3-

whether the police made [the suspect] aware that []he was free to refrain from answering questions, or to otherwise end the interview." Id.

Examining the totality of the circumstances presented in this case, I conclude that Sanchez-Gallegos was not in custody for the purposes of Miranda. First, Sanchez-Gallegos was not questioned in a police-dominated atmosphere. Specifically, only two border patrol agents were present during the questioning that elicited the incriminating statements. Further, while the questioning occurred in the secondary checkpoint office, Sanchez-Gallegos was directed to that location during the search of his vehicle and after he submitted to a consensual pat-down search. See United States v. Butler, 249 F.3d 1094, 1100–01 (9th Cir. 2001) ("[T]he mere detention of a person in a border station's security office from which he or she is not free to leave, while a search of a vehicle occurs, is not 'custody' for [Miranda] purposes.").

Second, the nature and length of the officers' questioning was not accusatory or coercive. Specifically, there is no indication that the border patrol agents spoke in a threatening or accusatory tone and the agents did not display their weapons during the inquiry. Further, Sanchez-Gallegos was not placed in handcuffs or a holding cell, he was not told that he was under arrest, and he was not questioned for a long period of time. In fact, the questioning that elicited the incriminating statements at issue in this case was brief. However, Sanchez-Gallegos was not informed of his right to terminate the encounter with the agents.

Nevertheless, when considering the totality of the circumstances, I conclude that Sanchez-Gallegos was not in custody for the purposes of <u>Miranda</u>. <u>See</u> <u>United States v. Jones</u>, 523 F.3d 1235, 1240 (10th Cir. 2008) ("Although these factors are useful, we emphasize that we must look to the totality of the circumstances and consider the police-citizen encounter as a whole, rather than picking some facts and ignoring others.").

As Sanchez-Gallegos was not in custody for the purposes of <u>Miranda</u>, I also conclude that the district court did not err in denying the motion to suppress his initial incriminating statements.

No. 09-2146, <u>United States v. Sanchez-Gallegos</u>

**EBEL**, Circuit Judge, concurring.

I agree with both of my respected panel members that Mr. Sanchez-Gallegos' conviction should be affirmed. However, I part ways with the majority in its conclusion that Mr. Sanchez-Gallegos was not in custody when he made his initial incriminating statement to Border Patrol Agent Gonzalez. In my view, Mr. Sanchez-Gallegos was in custody at that point, and it was incumbent upon the agents to warn him of his rights under <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), prior to that interrogation. However, I believe that the officers' administration of the <u>Miranda</u> warning after that initial statement was sufficient to advise Mr. Sanchez-Gallegos of his rights, and to render the statements made after the warning—the vast bulk of the statements that led to Mr. Sanchez-Gallegos' arrest—admissible. Thus, I believe that while the admission of the single pre-<u>Miranda</u> statement was erroneous, the error was in fact harmless. Accordingly, I agree that Mr. Sanchez-Gallegos' conviction should be affirmed.

**I.    Mr. Sanchez-Gallegos Was In Custody at the Time of His Initial Statement**

The majority is correct that "a routine stop at a fixed border checkpoint, <u>i.e.</u>, a stop within the parameters set forth by this court in [<u>United States v. Massie</u>, 65 F.3d 843 (10th Cir. 1995)], is not custodial and <u>Miranda</u> warnings are not necessary." <u>United States v. Hudson</u>, 210 F.3d 1184, 1191 (10th Cir. 2000). In

Massie, we held that "during a routine fixed-checkpoint stop a border patrol agent may ask questions reasonably related to his duties and explore suspicious circumstances, but must be brief and unintrusive." 65 F.3d at 848 (emphasis added). In that case, we determined that border patrol agents' detention and questioning of defendants were sufficiently brief and unintrusive so as not to exceed the confines of a routine checkpoint stop where the "agents' questioning lasted only eight to eleven minutes from the time Defendants were stopped at [the] primary [inspection area] to the moment the dog alerted on the trunk," and where "[t]he agents questioned Defendants about citizenship, vehicle ownership, vehicle contents, destination, and travel plans." Id. at 849.

I agree with Chief Judge Briscoe's opinion that the facts of this case "take it outside of the Massie heartland." Hudson, 210 F.3d at 1191. First, Mr. Sanchez-Gallegos had been detained for approximately forty to fifty minutes before Agent Gonzalez asked the questions that elicited Mr. Sanchez-Gallegos' initial incriminating statement. Second, although consensual, Mr. Sanchez-Gallegos was directed to a secondary checkpoint, subjected to a canine sniff of his vehicle, and patted down. The interior of his vehicle was then searched by border patrol agents and he was questioned in a secondary checkpoint office. In addition, Agent Gonzalez's questions that elicited Mr. Sanchez-Gallegos' testimony were anything but unintrusive. As Agent Gonzalez testified at the suppression hearing:

> I asked him about all the inconsistencies that we had found, and I
> told him about the fact that he had lied to me about the travel

-2-

> plans, that he had told me he was a U.S. citizen, that he had all this money that he couldn't explain to me how he got it, and that he had some birth certificates for children. I told him that I believed there was a group of children walking around the checkpoint and that my concern was that, if they were, they could be exposed to the elements and maybe, as I have seen before, die in the desert.

R., vol. III at 28. Under these circumstances, the detention and questioning of Mr. Sanchez-Gallegos exceeded the parameters set forth in Massie.

Chief Judge Briscoe nonetheless concludes that Mr. Sanchez-Gallegos was not in custody for the purposes of Miranda under the totality of circumstances presented here. To determine whether a suspect is in custody for the purposes of Miranda, we "must decide whether a reasonable person in [the suspect's] position would have understood [his] freedom of action to have been restricted to a degree consistent with formal arrest." United States v. Revels, 510 F.3d 1269, 1275 (10th Cir. 2007). "Several relevant factors inform our fact-specific analysis, including: (1) whether the circumstances demonstrated a police-dominated atmosphere; (2) whether the nature and length of the officers' questioning was accusatory or coercive; and (3) whether the police made [the suspect] aware that [he] was free to refrain from answering questions, or to otherwise end the interview." Id. I believe that this analysis inevitably leads to the conclusion that Mr. Sanchez-Gallegos was in custody.

First, the circumstances demonstrate a police-dominated atmosphere. Mr. Sanchez-Gallegos was removed from his vehicle, taken to a separate checkpoint office, and interrogated in the presence of two border patrol agents, while two

other agents searched his vehicle. Chief Judge Briscoe believes that this does not suffice to create a police-dominated atmosphere because (1) Mr. Sanchez-Gallegos was directed to the secondary checkpoint office during the search of his vehicle and only after he submitted to a consensual pat-down search, and (2) only two border patrol agents were present during the initial interrogation. I respectfully disagree. First, as Judge Holmes recognizes, the search of Mr. Sanchez-Gallegos' vehicle was completed before he was subjected to the interrogation that elicited his incriminating statement. Second, it is unclear why two border patrol agents questioning Mr. Sanchez-Gallegos alone in a border checkpoint office is insufficient to constitute a police-dominated atmosphere. Moreover, more than two agents were present at the checkpoint, as at least two others searched Mr. Sanchez-Gallegos' vehicle. Therefore, I find that this factor supports a conclusion that Mr. Sanchez-Gallegos was in custody at the time of the interrogation.

The second factor— whether the nature and length of the officers' questioning was accusatory or coercive—is a closer call. On the one hand, I think it is an inescapable conclusion that the agents' questioning was accusatory. Agent Gonzales not only accused Mr. Sanchez-Gallegos of lying and giving inconsistent statements, but Gonzales showed Mr. Sanchez-Gallegos the birth certificates and told him that a group of children "could be exposed to the elements and maybe, as

I have seen before, die in the desert." R., vol. III at 28. I fail to see how such questioning is not plainly accusatory.

On the other hand, as my respected panel members point out, Mr. Sanchez-Gallegos was not subjected to or threatened with any physical mistreatment, was not placed in handcuffs or a holding cell, and was not questioned for a long period of time before the Miranda warning was given. Under these circumstances, the agent's questioning, while accusatory, did not rise to the level of coercion. Compare United States v. Eckhart, 569 F.3d 1263, 1276 (10th Cir. 2009) (finding stop to be noncoercive where defendant "was never handcuffed or placed in a police cruiser and no weapons were drawn" and "the officers were polite in their demeanor and did not use or threaten the use of force at any time"), United States v. Lamy, 521 F.3d 1257, 1263 (10th Cir. 2008) (finding second factor not met where "the interview lasted for about an hour and . . . there was no indication that the questioning was unusually confrontational"), and United States v. Bennett, 329 F.3d 769, 775 (10th Cir. 2003) (finding that coercive factors were not present where police did not restrain the defendant while questioning him and told him he was not under arrest), with United States v. Perdue, 8 F.3d 1455, 1464, 1467 (10th Cir. 1993) (finding "overwhelmingly" coercive atmosphere where defendant "was forced out of his car and onto the ground at gunpoint" and then questioned by officers "while police helicopters hovered above" and "while

-5-

the officers kept their guns drawn on him and his pregnant fiancée").
Accordingly, this factor cuts both ways in the analysis.

Finally, as the majority acknowledges, Mr. Sanchez-Gallegos was never informed by the agents that he was free to end the interview. This weighs significantly in favor of finding custodial interrogation in this case. See Revels, 510 F.3d at 1276 (finding that the suspect was in custody for Miranda purposes where "the police never indicated to [the suspect] that she was free to leave or otherwise at liberty to terminate the police questioning"); United States v. Griffin, 7 F.3d 1512, 1518 (10th Cir. 1993) ("[T]he lack of a police advisement that the suspect is at liberty to decline to answer questions or free to leave is a significant indication of a custodial detention.").

Under the totality of the circumstances described above, I conclude that Mr. Sanchez-Gallegos was in custody when he was questioned by Agent Gonzalez, and therefore that the failure to give Mr. Sanchez-Gallegos a Miranda warning rendered his initial statement inadmissible. However, I do not believe that this error warrants reversal. As discussed below, the subsequent Miranda warning given to Mr. Sanchez-Gallegos was effective to render his later statements admissible, and thus the district court's admission of Mr. Sanchez-Gallegos' pre-Miranda statement was harmless.

-6-

**II.    The District Court Did Not Err in Admitting Mr. Sanchez-Gallegos' Post-<u>Miranda</u> Statements.**

After Mr. Sanchez-Gallegos made the initial incriminating statement, Agent Gonzalez read Mr. Sanchez-Gallegos his <u>Miranda</u> rights and Mr. Sanchez-Gallegos waived his right to remain silent.  He then proceeded to confess to involvement with the crime, and even went so far as to call Victor so that ICE agents could find the children.  The question, then, becomes whether the <u>Miranda</u> warning given after the incriminating statement sufficed to render the post-warning statements admissible, notwithstanding the prior violation of Mr. Sanchez-Gallegos' <u>Miranda</u> rights.

In <u>Missouri v. Seibert</u>, the Supreme Court in a fragmented opinion found that a <u>Miranda</u> warning given mid-interrogation pursuant to a "question-first tactic" was insufficient to render the defendant's later statements admissible.  542 U.S. 600, 617 (2004).  The four-justice plurality set forth the following five "relevant facts that bear on whether <u>Miranda</u> warnings delivered midstream could be effective":

> [1] the completeness and detail of the questions and answers in the first round of interrogation, [2] the overlapping content of the two statements, [3] the timing and setting of the first and the second, [4] the continuity of police personnel, and [5] the degree to which the interrogator's questions treated the second round as continuous with the first.

<u>Id.</u> at 615.

In a concurring opinion, however, Justice Kennedy argued for "a much narrower test applicable only to the infrequent case . . . in which

the two-step interrogation technique was used in a calculated way to undermine the Miranda warning." Id. at 622 (Kennedy, J., concurring in the judgment). Where a two-step interrogation technique was not so used, Justice Kennedy believed that "[t]he admissibility of postwarning statements should continue to be governed by the principles of [Oregon v. Elstad 470 U.S. 298(1985)]." Id. In Elstad, the Court concluded that "absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion," and thus "[a] subsequent administration of Miranda warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." Elstad, 470 U.S. at 314. Accordingly, the Court held that statements made after a voluntary Miranda waiver could be admissible as long as the pre-Miranda statements were also uncoerced. Id. at 318. "[A] suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite Miranda warnings." Id.

In United States v. Carrizales-Toldeo, we noted that determining the holding of Siebert is not easy in light of the fragmented nature of the opinion. 454 F.3d 1142, 1151 (10th Cir. 2006). We declined to

-8-

determine whether the four-justice plurality or Justice Kennedy's concurrence reflects the holding of <u>Seibert</u>, and instead applied both tests to the facts of that case. <u>Id.</u> However, I would hold that Justice Kennedy's concurrence, as the narrowest grounds for the Supreme Court's decision to suppress, represents the holding of <u>Seibert</u>.[1]

Under the test advanced by Justice Kennedy, Mr. Sanchez-Gallegos' post-<u>Miranda</u> statements are admissible. The record does not reflect that a "two-step interrogation technique was used in a calculated way to undermine the <u>Miranda</u> warning." 542 U.S. at 622 (Kennedy, J.,

---

[1] The majority of our sister circuits have reached the same conclusion. <u>See</u> <u>United States v. Capers</u>, No. 07-1830-cr, 2010 U.S. App. LEXIS 24516, at *14 (2d Cir. Dec. 1, 2010) (noting that the Second Circuit applies Justice Kennedy's approach); <u>United States v. Torres-Lona</u>, 491 F.3d 750, 758 (8th Cir. 2007) ("We treat Justice Kennedy's concurrence as controlling since it provided the fifth vote necessary for a majority and since it was decided on narrower grounds than the plurality opinion."); <u>United States v. Street</u>, 472 F.3d 1298, 1313 (11th Cir. 2006) ("Because <u>Seibert</u> is a plurality decision and Justice Kennedy concurred in the result on the narrowest grounds, it is his concurring opinion that provides the controlling law."); <u>United States v. Courtney</u>, 463 F.3d 333, 338 (5th Cir. 2006) ("[W]e find Seibert's holding in Justice Kennedy's opinion concurring in the judgment."); <u>United States v. Williams</u>, 435 F.3d 1148, 1158 (9th Cir. 2006) (finding that Justice Kennedy's "narrower test . . . represents Seibert's holding"); <u>United States v. Kiam</u>, 432 F.3d 524, 532 (3d Cir. 2006) ("This Court applies the Seibert plurality opinion as narrowed by Justice Kennedy."); <u>United States v. Mashburn</u>, 406 F.3d 303, 309 (4th Cir. 2005) ("Justice Kennedy's opinion therefore represents the holding of the <u>Seibert</u> Court: The admissibility of postwarning statements is governed by <u>Elstad</u> unless the deliberate 'question-first' strategy is employed."). <u>But see</u> <u>United States v. Heron</u>, 564 F.3d 879, 884 (7th Cir. Ill. 2009) ("Although Justice Kennedy provided the crucial fifth vote for the majority, we find it a strain at best to view his concurrence taken as a whole as the narrowest ground on which a majority of the Court could agree. . . . Justice Kennedy's intent-based test was rejected by both the plurality opinion and the dissent in Seibert.").

concurring in the judgment). Thus, we look to <u>Elstad</u>, which held that later statements could be admissible as long as the pre-<u>Miranda</u> statements were uncoerced. <u>Elstad</u>, 470 U.S. at 318. As discussed above, while the agent's pre-warning questioning was accusatory, it did not rise to the level of coercion such that Mr. Sanchez-Gallegos' post-<u>Miranda</u> statements are inadmissible under <u>Elstad</u>. Accordingly, I find that Mr. Sanchez-Gallegos' statements made after receiving the <u>Miranda</u> warning were properly admitted.[2]

---

[2] I acknowledge that the conclusion might be different under the plurality's test in <u>Seibert</u>. This test "concern[s] the relationship between the first and second interrogations." <u>Carrizales-Toldeo</u>, 454 F.3d at 1150. In this case, there was little distinction in the two phases of questioning. Although questions and answers became more specific during the second interrogation, the content clearly overlapped, as both interrogations concerned the transportation of children. Moreover, there was no break in the timing, setting, or personnel of the two interrogations. Finally, the questioning treated the second round as continuous with the first, as the second followed immediately upon the first and followed up on Mr. Sanchez-Gallegos' pre-<u>Miranda</u> statement.

**III.    The Admission of Mr. Sanchez-Gallegos' Pre-<u>Miranda</u> Statement Was    Harmless Error**

Although the district court erred in admitting Mr. Sanchez-Gallegos' pre-<u>Miranda</u> statement, this Court may nevertheless affirm his conviction if that error was harmless.  "The Supreme Court has applied harmless error analysis to a wide range of constitutional errors, including the admission of unlawful confessions." <u>Perdue</u>, 8 F.3d at 1469 (internal quotation marks omitted).  "A constitutional error is harmless and may be disregarded if it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained."  <u>United States v. Holly</u>, 488 F.3d 1298, 1307 (10th Cir. 2007) (internal quotation marks omitted).

As a general rule, it is the government's burden to prove that an error was harmless.  <u>See</u> <u>United States v. Lott</u>, 310 F.3d 1231, 1251 (10th Cir. 2002) (citing <u>United States v. Miller</u>, 111 F.3d 747, 751 (10th Cir. 1997)).  Here, the government failed to argue in its brief or at oral argument that the admission of Sanchez-Gallegos' unwarned confession at trial was harmless.  "Nevertheless, where the government has failed to assert harmless error, this court may in its discretion initiate harmless error review in an appropriate case."  <u>Holly</u>, 488 F.3d at 1307 (internal quotation marks and citation omitted).  "In deciding whether to exercise its discretion to address harmlessness, this court considers '(1) the length and complexity of the record; (2) whether the harmlessness of the errors is certain or debatable; and (3) whether a reversal would result in protracted, costly, and

-11-

futile proceedings in the district court.'" Id. at 1308 (quoting United States v. Samaniego, 187 F.3d 1222, 1225 (10th Cir. 1999)).[3]

Considering harmless error sua sponte is appropriate in this case. As to the first factor, the record in this case comprises three volumes and more than 600 pages of material, but consists primarily of transcripts. Though a long and complex record normally weighs against sua sponte harmless-error review unguided by the arguments of the parties, Samaniego, 187 F.3d at 1225, in this case the record, while lengthy, is relatively straightforward, as is the case against Mr. Sanchez-Gallegos.

As to the second factor, even where a record is long and complex, sua sponte harmless-error review may be appropriate "where the certainty of the harmlessness is readily apparent." Holly, 488 F.3d at 1308. Here, there can be little doubt that the error of admitting testimony of Sanchez-Gallegos' one-sentence unwarned statement was harmless. Whereas this statement was short and vague, in his properly admitted post-Miranda statements, Mr. Sanchez-Gallegos explained the situation to the officers in detail and even assisted the officers in finding Victor and the children. The detail and extent of the post-

---

[3] As noted by the Court in Holly, we have "quite reasonably" questioned the relevance of the third factor. Holly, 488 F.3d at 1308 n.8; Samaniego, 187 F.3d 1225 n.2 ("Without eviscerating the doctrine, cost and potentially protracted proceedings cannot preclude reversal if an error was not harmless."). Here, as in Holly, because the first two factors indicate that a sua sponte harmless-error review is appropriate in this case, we do not need to address the third factor. Holly, 488 F.3d at 1308 n.8.

<u>Miranda</u> statements so vastly outweigh the pre-<u>Miranda</u> statement that it is "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." <u>Holly</u>, 488 F.3d at 1307. Accordingly, a sua sponte harmless-error review is appropriate in this case, and inexorably leads to the conclusion that the admission of Mr. Sanchez-Gallegos' pre-<u>Miranda</u> statement was harmless.

## IV.  Conclusion

While I believe that Mr. Sanchez-Gallegos was in custody at the time he made the unwarned admission, the subsequent <u>Miranda</u> warning sufficed to make the later statements admissible, and in light of the substance of those later statements, the admission at trial of the pre-warned statement was harmless error. I therefore concur with the judgment of the majority.